David H.S. Commins (CSBN 124205)
Kenneth C. Webster  (CSBN 179058)
COMMINS & WEBSTER, P.C.
400 Montgomery Street, Suite 200
San Francisco, CA 94104
Tel (415) 391-6490
Fax (415) 391-6493
david@commins.com
ken@commins.com

Attorneys for Plaintiff
Shoreline Capital Management, Ltd.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| SHORELINE CAPITAL MANAGEMENT, LTD., a British Virgin Islands company limited by shares,,<br><br>　　　　Plaintiff,<br><br>　　vs.<br><br>XIAOBING SUN, an individual, also known as DANIEL SUN,<br><br>　　　　Defendant.<br>_____/ | No.　　JW CV 08 0121<br><br>SHORELINE CAPITAL MANAGEMENT, LTD.'S MEMORANDUM SUPPORTING *EX PARTE* APPLICATION FOR TRO AND OSC RE PRELIMINARY INJUNCTION, AND FOR ORDER GRANTING LEAVE TO CONDUCT EXPEDITED DISCOVERY |

SHORELINE CAPITAL MANAGEMENT, LTD.'S MEMORANDUM SUPPORTING *EX PARTE*
APPLICATION FOR TRO AND OSC RE PRELIMINARY INJUNCTION
AND FOR EXPEDITED DISCOVERY ORDER

# TABLE OF CONTENTS

I   INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II  FACTUAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    A.  Shoreline, A British Virgin Islands Private Investment
        Company, Operates In A Highly Specialized Market
        In Distressed Debt In China . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    B.  Shoreline Created Its Own Field Of Business By Devoting
        Considerable Resources To The Development Of A Unique
        Business Model . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    C.  Shoreline Has Taken Reasonable Measures To Protect As
        Confidential The Shoreline Pricing Model And Other
        Confidential Information And Materials . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    D.  Shoreline Recruits Mr. Sun And He Signs A Non-Disclosure
        Agreement And Employment Letter Agreement
        And Receives An Employment Handbook . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    E.  Mr. Sun Becomes Familiar With The Shoreline Pricing
        Model As Well As With Shoreline's Customers, Vendors
        And Employees, Then Establishes A Competing Firm . . . . . . . . . . . . . . . . . . . 8

    F.  Asia LTI, Begins To Solicit Shoreline's Investors, Bankers
        And Employees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    G.  Shoreline, Which, Upon Learning Of Mr. Sun's Activities,
        First Attempted To Dissuade Him From Them, Is Now Being
        Hampered In Its Business By Interference From Asia LTI . . . . . . . . . . . . . . . . . 14

III LEGAL ANALYSIS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

    A.  Injunctive Relief Is Available Under The UTSA In California . . . . . . . . . . . . . . 16

    B.  Shoreline Meets The Standards For Injunctive . . . . . . . . . . . . . . . . . . . . . . . . . 17

        1.  Shoreline Will Suffer Irreparable Injury If Injunctive
            Relief Is Not Granted . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

        2.  Shoreline Is Likely to Prevail On The Merits . . . . . . . . . . . . . . . . . . . . . . 19

        3.  The Balance Of Equities Favors Shoreline's Request For
            Injunctive Relief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

        4.  Granting An Injunction Will Serve The Public Interest . . . . . . . . . . . . . . . . 23

IV  CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

SHORELINE CAPITAL MANAGEMENT, LTD.'S MEMO SUPPORTING *EX PARTE* APPLICATION
FOR TRO AND OSC RE PRELIMINARY INJUNCTION AND EXPEDITED DISCOVERY ORDER

TABLE OF AUTHORITIES

CASES

*American Paper & Packaging Products, Inc. v. Kirgan*, 183 Cal. App. 3d 1318 (1986) . . . . . . 20

*Bay Area Addiction Research & Treatment, Inc. v. City of Antioch*,

179 F. 3d 725 (9th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *24*

*Department of Parks & Rec. for State of Calif. v. Bazaar Del Mundo Inc.*,

448 F. 3d 1118 (9th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*DVD Copy Ass'n Inc. v. Bunner*, 31 Cal. 4th 864 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Gordon v. Landau*, 49 Cal. 2d 690 (1958) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Gordon v. Wasserman*, 153 Cal. App. 2d 328 (1957) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Hollingsworth Solderless Terminal Co. v. Turley*, 622 F. 2d 1324 (9th Cir. 1980) . . . . . . . . . 19

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bradley*, 756 F. 2d 1048 (4th Cir. 1985) . . . . . . 18

*Merrill Lynch, Pierce, Fenner & Smith v. Kramer*, 816 F. Supp. 1242 (N.D. Ohio 1992) . . . . . 23

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Stidham*, 658 F. 2d 1098 (5th Cir. 1981) . . . . . 18

*Michaels v. Internet Entertainment Group*, 5 F. Supp. 2d 823 n.2 (C.D. Cal. 1998) . . . . . . . . . 10

*Morlife, Inc. v. Perry*, 56 Cal. App. 4th 1514 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . 16, 21, 22

*Muggill v. Reuben H. Donnelley Corp.*, 62 Cal. 2d 239 (1965) . . . . . . . . . . . . . . . . . . . . . . . . 19

*ReadyLink Healthcare v. Cotton*, 126 Cal. App. 4th 1006 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Republic of the Philippines v. Marcos*, 862 F. 2d 1355 (9th Cir. 1988) . . . . . . . . . . . . . . . . 10, 24

*Stanley v. University of Southern California*, 13 F. 3d 1313, 1319 (9th Cir. 1994) . . . . . . . 17, 24

STATUTES

California Business & Professions Code §16600 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

California Civil Code §3426.1 (b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

California Civil Code §3426.1 (d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

California Civil Code §3426.2 (a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 20

California Civil Code §3426.2(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Civil Code § 3426 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

SHORELINE CAPITAL MANAGEMENT, LTD.'S MEMO SUPPORTING *EX PARTE* APPLICATION
FOR TRO AND OSC RE PRELIMINARY INJUNCTION AND EXPEDITED DISCOVERY ORDER

I

## INTRODUCTION

This case proves the old axiom that no good deed goes unpunished.

Early in 2007 Shoreline Capital Management, Ltd. (Shoreline) recruited and hired what seemed to be two promising students in the University of Chicago MBA program, Defendant Xiaobing "Daniel" Sun, and Qiang Du, to be trained as, and eventually, if all went well, to work as Portfolio Managers in Shoreline's unique private investment business in China. This was an exceptional opportunity for Messrs. Sun and Du that they quickly repaid Shoreline by purloining its confidential information and using it to compete and interfere with Shoreline's business.

After signing non-disclosure agreements and employment agreements in which they agreed to maintain as confidential Shoreline's proprietary and trade secret information, and after receiving Employment Handbooks that carefully spelled out Shoreline's concerns about confidential information, Messrs. Sun and Qiang were granted access to Shoreline's most precious financial model and other confidential information, and used it to set up their own competing company using precisely the same model and confidential information. They were so brazen about their use of Shoreline's model and other information that, in addition to pursuing Shoreline's customers and vendors, they even tried to recruit one of its principals using as a lure the very same financial model, changed only to bear the name of their new company.

Shoreline has learned of Mr. Sun's (and Mr. Du's) transgressions in a piecemeal fashion. As a full picture has recently emerged, Shoreline has attempted to dissuade Mr. Sun from further using its financial model and other confidential information, unfortunately to no avail. Regrettably, its only alternative to protect its core asset now, in the face of recent additional tampering with its investors, is litigation, including pursuit of injunctive relief.

- 1 -

Shoreline believes that Mr. Du and the new company are beyond the jurisdictional reach of this Court; it intends to pursue all available legal remedies against them in China. But Mr. Sun, who is domiciled in this District, and who has been soliciting Shoreline's most important investors here, should be ordered to stop using Shoreline's financial model, its list of prospective portfolio assets, and its other confidential information, indeed, to turn over all copies of it in his possession, custody or control, and to stop soliciting Shoreline's client investors, portfolio prospects, vendors and employees.

II

FACTUAL BACKGROUND

A.    Shoreline, A British Virgin Islands Private Investment Company, Operates In A Highly Specialized Market In Distressed Debt In China

Shoreline is a British Virgin Islands company limited by shares with its principal place of business in Guangzhou, China that conducts business in China through its wholly owned subsidiary, Shoreline Capital Consulting (Shenzhen) Co., Ltd. (Shoreline (Shenzhen)). Shoreline is a private investment firm that manages assets for institutional investors through investments in distressed assets in China. All of its investors are in the United States and some of its largest investors are in San Francisco. (Accompanying Declaration of Benjamin Fanger, ¶¶ 2-4.)

B.    Shoreline Created Its Own Field Of Business By Devoting Considerable Resources To The Development Of A Unique Business Model

Shoreline has a unique business model. Its primary asset is a particular financial model (the Shoreline Pricing Model) that took three and one-half years to develop, including many hundreds of hours by skilled and experienced financial people and hundreds of thousands of dollars. It has used this single model to invest over 76 million dollars in loans with principal

- 2 -

balances of over 1.5 billion dollars. All of its deals are based on this financial model, which is articulated in the form of an Excel spreadsheet.[1]  (Fanger Decl., ¶¶ 2-4.)

C.    Shoreline Has Taken Reasonable Measures To Protect As Confidential The Shoreline Pricing Model And Other Confidential Information And Materials

Shoreline employs over 25 people who work mostly in China with its wholly owned subsidiary, Shoreline (Shenzhen)[2], but two of whom work principally in Campbell, California. (Fanger Decl., ¶ 2.)  Most have executed non-disclosure agreements (NDAs) and, as part of their employment agreements, have countersigned employment agreement letters.  In those letters they have agreed not to resign and, within a period of two years following their departure from Shoreline, compete with Shoreline in the non-performing loan or distressed real estate investment area in China.  And all of these employees have agreed to keep strictly confidential all corporate documents, files, business-secrets and know-how.  (Fanger Decl., ¶ 5.)  What is more, all of Shoreline's employees, including Mr. Sun, have received the Employment Handbook. (Fanger Decl., ¶¶ 5 and 13; Declaration of Weihong Ye, ¶ 3; Declaration of Yonghui Wu, ¶ 3; Declaration of Wei Wang, ¶ 3; Declaration of Linlin Gong, ¶ 3.)

Shoreline included strong confidentiality language in its Employment Handbook to give notice of the highly confidential nature of its proprietary information to its employees.  (Fanger Decl., ¶ 5.)  It requires employees to avoid conduct that could harm the company and prohibits use of Shoreline's name except when doing business for Shoreline:

---

[1] Because of the confidential nature of the Shoreline Pricing Model, neither it nor the copy of it that Mr. Sun has been disseminating bearing the name of his new company, are attached to this Memorandum or any of the accompanying papers.  If necessary, however, Shoreline, would be willing to file it under seal for review by the Court.

[2] Guangzhou United (GU) is the onshore agent of Shoreline Shenzhen and officially employees Shoreline Shenzhen's workers.  GU's agency contract with Shoreline Shenzhen is for the sole purpose of employing Shoreline personnel and it is 100% funded by Shoreline.  (See, for example, Declaration of Linlin Gong, ¶ 1.)

1    Article 8: Employee Conduct: Employees should use professional judgment and

2    avoid any conduct that violates or potentially harms the best interests of the

3    Company.  Without prior approval, employees must only use the Company's

4    name or their titles when doing business for the Company.

5

6    The Employment Handbook also requires employees to maintain the confidentiality of

7    Shoreline's proprietary and trade secret information:

8

9    Article 9: Confidentiality: Employees shall follow and implement the Company's

10    confidentiality rules at all times.  All information obtained by employees,

11    including, but not limited to, asset/portfolio information, debtor information, asset

12    servicing strategies, debt collection status, models and forms of any kind used by

13    the Company, investment return models, evaluation models and all other related

14    information cannot be revealed to persons outside the team, including any other

15    employees within the Company that are not directly related to the cases in which

16    the information is used.  [A translation (from Mandarin) of these portions of the

17    Handbook is attached as Ex. D to the Fanger Decl.]

18

19    Over the last four years, Shoreline has developed relationships with sellers of distressed

20    assets in China.  In particular, it has developed close relationships with each of the four

21    state-owned asset management companies that are the only institutions permitted to sell

22    distressed debt at a discount in China.  Two of these, Huarong Asset Management Company

23    (Huarong) and Cinda Asset Management Company (Cinda), are particularly inclined to work

24    with Shoreline because Shoreline has purchased multiple portfolios from each of them.  As part

25    of its deal sourcing activities, Shoreline has set up a deal sourcing team that has created a list of

26    potential portfolios for investment (Potential Investment List).  (Fanger Decl., ¶ 4.)

27

28

SHORELINE CAPITAL MANAGEMENT, LTD.'S MEMO SUPPORTING *EX PARTE* APPLICATION
FOR TRO AND OSC RE PRELIMINARY INJUNCTION AND EXPEDITED DISCOVERY ORDER

Shoreline's owners have always considered the Shoreline Pricing Model, the Potential Investment List and other company documents to be highly confidential proprietary trade secrets. Because they are the primary tools in its business, the owners have always closely guarded them and have required confidentiality agreements to be signed by any person that was shown the documents.   (Fanger Decl., ¶ 5.)  Most, if not all of those working at Shoreline or Shoreline Shenzhen fully understood the importance of maintaining the secrecy of Shoreline's proprietary information, as well as the efforts that Shoreline's owners and managers undertook to maintain that secrecy.  (Gong Decl., ¶¶ 3-5; Wu Decl., ¶¶ 3 and 4; Wang Decl., ¶¶ 3-5; Declaration of Linyu Yang, ¶ 2.)

D.     Shoreline Recruits Mr. Sun And He Signs A Non-Disclosure Agreement And
       Employment Letter Agreement And Receives An Employment Handbook

Shoreline found Mr. Sun when he was a graduate student at the University of Chicago and Mr. Fanger, who is a principal of Shoreline, began to recruit him in this District where he, Mr. Sun, resided.  (Mr. Sun was attending weekend classes in Chicago.)  (Fanger Decl., ¶ 6.)  All interviews and meetings between Mr. Sun and Shoreline during the recruiting process were conducted in or near Campbell, California.  (Fanger Decl., ¶¶ 6 and 7.)

On or about January 26, 2007, while Shoreline was recruiting Mr. Sun, it asked him to sign a standard NDA and he did so.  (Fanger Decl., ¶ 7.)  The NDA stated that Shoreline would provide valuable information to Mr. Sun:

> [T]he Company has agreed to provide certain information to the Interested Party
> concerning the opportunity, which information includes certain confidential and
> proprietary information that is valuable to the Company, and is the exclusive
> property of the Company.

In exchange for receiving this valuable confidential information, Mr. Sun agreed that all non-public information he received from Shoreline would be deemed confidential:

All information, documents and other communications furnished by the Company to the Interested Party ("Proprietary Information") shall be deemed confidential. Proprietary Information shall not include any information which becomes generally available to the public other than as a result of disclosure by the Interested Party in breach of this Agreement, information already in the Interested Party's possession or information from a source not known to be bound by an Agreement.

And Mr. Sun agreed not to disclose any confidential information he received:

Unless otherwise agreed to in writing by the Company or as may be required by law or legal process, neither the Interested Party nor any of its affiliates or representatives will use, disclose or reveal any Proprietary Information for any purpose other than in direct connection with assessing the potential employment opportunity with the Company. [A copy of the NDA is Ex. A to the Fanger Decl.]

While Shoreline was recruiting Mr. Sun, but after he had signed the NDA, it disclosed to him the details of the Shoreline Pricing Model. This was consistent with Shoreline's normal business practice; it never knowingly shown the Shoreline Pricing Model to anyone who was not first made aware that it constituted confidential and proprietary information that was not to be disclosed outside Shoreline. (Fanger Decl., ¶¶ 5 and 8.)

Following the recruiting process, Shoreline offered Mr. Sun a job as a Portfolio Manager in Training. Its offer to him was memorialized in a March 1, 2007 letter. (Fanger Decl., ¶ 9 and Ex. B.) That letter explained that Mr. Sun would be located in Shoreline's Guangzhou office

- 6 -

with its subsidiary, Shoreline (Shenzhen).  It set forth the areas of business he would be expected to learn and master.  It specified that he would not resign to compete with Shoreline and that he would keep confidential the company's proprietary and trade secret information:

> You hereby also agree to not resign to compete or work for any competitor
> involved in non-performing loan[s] or distressed real estate investment[s] in
> China for a period of two years following your departure from Shoreline unless
> agreed to in writing by the company.  You also agree to keep strictly confidential
> all corporate documents, files, business secrets and know-how.

Mr. Sun countersigned this letter on March 5, 2007 and promptly delivered a copy of it to Mr. Fanger in Campbell, California. (Fanger Decl., ¶ 9.)  Mr. Sun started working at Shoreline on March 28, 2007 and has not formally resigned or been fired.  (Declaration of Xiaolin Zhang, ¶ 2.)

Mr. Fanger also recruited Qiang Du from the University of Chicago.  While Shoreline was recruiting Mr. Du, it asked him to sign a standard NDA and he did so on March 13, 2007. (Fanger Decl., ¶ 8.)  Following the recruitment process, Shoreline also offered Mr. Du a job as a Portfolio Manager in Training, and Mr. Du also signed an Offer Letter just as Mr. Sun had done. (Fanger Decl., ¶ 10 and Ex. C.)

By their terms, both Offer Letters were to serve as employment agreements and each also included confidentiality and non-compete provisions. (Fanger Decl., ¶ 11.)  Shoreline included non-compete provisions in the agreements precisely because neither Mr. Sun nor Mr. Du had prior work experience in the fund management business, and Shoreline wanted to avoid the possibility that it would spend time and money providing them with proprietary know-how only to have them leave and use that knowledge to compete directly with Shoreline.  (Id., ¶ 12.)

SHORELINE CAPITAL MANAGEMENT, LTD.'S MEMO SUPPORTING *EX PARTE* APPLICATION
FOR TRO AND OSC RE PRELIMINARY INJUNCTION AND EXPEDITED DISCOVERY ORDER

1    Shortly after Mr. Sun executed the employment agreement letter, he began working for

2  Shoreline mostly in Guangzhou, China. He received a copy of the Employment Manual and was

3  informed that he was obliged to become familiar with its contents, and the company lent to Mr.

4  Sun a company-owned laptop onto which he copied many confidential and proprietary files in the

5  course of his work at Shoreline. (Fanger Decl., ¶ 13.)

6

7  E.    Mr. Sun Becomes Familiar With The Shoreline Pricing Model As Well As With

8        Shoreline's Customers, Vendors And Employees, Then Establishes A Competing Firm

9

10    In the course of his employment, Mr. Sun was permitted to view and became familiar

11  with Shoreline's business model and the Shoreline Pricing Model on which it was based, and

12  was introduced to its most important investors in the United States, as well as to bankers and

13  asset management companies in China from whom Shoreline acquires loan portfolios. He also

14  became familiar with its employees, and he was allowed to become familiar with Shoreline's

15  actual and prospective asset/portfolio deals and customers in China.

16

17    Between March and July 2007, Mr. Sun worked for Shoreline. Then, at the end of July

18  he purportedly left for vacation, though he never returned. On a Sunday in early August, Mr.

19  Fanger had lunch with Mr. Sun in Guangzhou, China. During the lunch Mr. Sun informed Mr.

20  Fanger that he was considering leaving the company. Mr. Sun asked Mr. Fanger if he wanted to

21  terminate Mr. Sun. Mr. Fanger informed Mr. Sun that Shoreline did not want to terminate him

22  and hoped he would stay, provided he come back from vacation leave and do his best to achieve

23  the seven job requirements outlined in the Offer Letter. Mr. Fanger also asked him what he

24  would do if he did leave Shoreline and Mr. Sun stated he would probably do some kind of

25  investment business work. Mr. Fanger told him that if he did so, Mr. Fanger would be happy to

26  source capital for his deals as long as they were not within the distressed asset market in which

27  he had agreed not to compete. (Fanger Decl., ¶ 15.)

28

SHORELINE CAPITAL MANAGEMENT, LTD.'S MEMO SUPPORTING *EX PARTE* APPLICATION
FOR TRO AND OSC RE PRELIMINARY INJUNCTION AND EXPEDITED DISCOVERY ORDER

1    Instead of returning to Shoreline, Mr. Sun and Mr. Du set up a new company called Asia

2  Long Term Investment, or Asia LTI (or Rongten Investment Co. in Chinese), in Guangzhou,

3  China, where Shoreline has its headquarters. Asia LTI was designed to do precisely the same

4  business as Shoreline in the distressed debt market, precisely the same field in which Shoreline

5  operates, in the same geographic market. (Mr. Du did not leave Shoreline until September 2007,

6  but began to work with Mr. Sun to set up Asia LTI before that time.)

7

8    It has become clear now that during much of the time Mr. Sun was working at Shoreline,

9  he was planning and developing the beginnings of a competing business.[3] He often asked other

10  Shoreline staff for information, data and contacts that he had no use for unless he intended to

11  raise his own investment fund. For example, he repeatedly asked Mr. Fanger and others for a

12  copy of Shoreline's new fund's Private Placement Memorandum. (Fanger Decl., ¶ 14; Zhang

13  Decl. ¶ 3.) He also discussed the formation of a competing business with one of Shoreline's

14  senior asset managers, Yonghui Wu.[4] Mr. Wu relates the following telephone conversation from

15  July 2007 (while Mr. Sun was still employed by Shoreline):

16

17    Mr. Sun: "Yonghui, It's my feeling that people in favorable circumstances don't

18    take risks, am I right?"

19

20    Mr. Wu: "What? I'm in the subway, I'm not sure I understand you."

21

22    [3] During his tenure at Shoreline, Mr. Sun asked to be introduced to the presidents the Chinese state-owned
asset management companies from whom Shoreline acquires its loan portfolios. He even suggested that one of
23  Shoreline's partners travel with him to meet these executives. He also asked to be trained regarding U.S. dollar
repatriation issues which would be key to setting up a similar investment fund. No other employees in Shoreline had
24  ever asked to do these things. This behavior was strange for a new employee who knew little about the
non-performing loan business. (Zhang Decl. ¶2.)

25
    [4] While Mr. Sun was an employee at Shoreline, he told several employees that it would be easy for him to
26  raise a similar fund and source deals in China. (Zhang Decl. ¶3.) On July 17, 2007 Mr. Sun suggested to a Shoreline
partner that he should be in charge of communication with sellers, investors, limited partners and co-investors in
27  Shoreline. (All these responsibilities would be key to setting up a fund like Shoreline's. (Id., ¶4.) Indeed, in
September 2007, he told employees at Shoreline that, together with a Beijing lawyer, he was preparing to purchase
28  an asset portfolio from Cinda. (Yang Decl., ¶ 4(2)-(3).)

SHORELINE CAPITAL MANAGEMENT, LTD.'S MEMO SUPPORTING *EX PARTE* APPLICATION
FOR TRO AND OSC RE PRELIMINARY INJUNCTION AND EXPEDITED DISCOVERY ORDER

1    Mr. Sun: "What I mean is, you're the person in charge of the "#1233" portfolio, so

2    you wouldn't be willing to start a competing business, would you?"

3

4    Understanding him to have the intent that Mr. Wu join him to start a competing

5    business, Mr. Wu answered: "I don't think that being in charge of portfolio

6    "#1233" constitutes favorable circumstances.  But since I took on the

7    responsibility of managing it, I'm certainly going to stick to it."

8

9    Mr. Sun: "Oh, well then, we'll have to talk later.  Goodbye."

10

11    Mr. Wu: "Goodbye."

12

13    [Wu Decl., ¶ 5.] [5]

14

15 F.  Asia LTI, Begins To Solicit Shoreline's Investors, Bankers And Employees

16

17    Operating as Asia LTI, a company that is not yet registered to do business in China, Mr.

18 Sun and Mr. Du began to contact Shoreline's investors in this District and other locations in the

19 U.S. as well as bankers and asset managers in China who are among Shoreline's most important

20 contacts. (Declaration of Deguang Zheng, ¶¶ 2-4[6]; Declaration of Haiqiang Huang, ¶¶ 2 and 3[7];

21

22

23

24   [5] District Courts can rely on hearsay evidence at the temporary restraining order or preliminary injunction stage of litigation. *Republic of the Philippines v. Marcos*, 862 F. 2d 1355, 1363 (9th Cir. 1988); *Michaels v. Internet Entertainment Group*, 5 F. Supp. 2d 823, 832 n.2 (C.D. Cal. 1998).

25

26   [6] Mr. Sun contacted people at Hurang, a very important sourcing client for Shoreline and attempted to convince them not to speak to anyone at Shoreline other than himself, even though he was no longer an employee of Shoreline at the time.

27

28   [7] Mr. Sun contacted Cinda, a very important sourcing client for Shoreline and attempted to acquire a portfolio of loans from it.

SHORELINE CAPITAL MANAGEMENT, LTD.'S MEMO SUPPORTING *EX PARTE* APPLICATION
FOR TRO AND OSC RE PRELIMINARY INJUNCTION AND EXPEDITED DISCOVERY ORDER

1   Declaration of Yan Wen, ¶¶ 2 and 3)[8]

2

3       Messrs. Sun and Du also attempted to recruit employees from Shoreline to come to work

4   for Asia LTI, including senior asset manager Yonghui Wu (Fanger Decl., ¶ 17 and Ex. E; Wu

5   Decl., ¶ 5.), and asset manager Haiqiang Huang.  (Huang Decl., ¶ 3.)

6

7       And up until September 18, 2007, when they were establishing Asia LTI, and despite

8   Shoreline's requests for him to return it, Mr. Sun kept Shoreline's laptop computer that held its

9   confidential and trade secret information.  (Fanger Decl., ¶ 16; Yang Decl. ¶ 3.)

10

11      By e-mail and other means, Mr. Sun has solicited other investors in Shoreline in the

12  United States, including Asia Alternatives in San Francisco.  Asia Alternatives is a fund of funds

13  that has committed to invest 15 million dollars in Shoreline's presently open fund, as well as an

14  additional 10 million dollars from the California Public Employees' Retirement System, one of

15  Shoreline's most important investors, and others.  (Fanger Decl., ¶ 18; Zhang Decl., ¶ 5.)

16

17      On November 11, 2007, Mr. Sun sent a PowerPoint presentation to Valerie Cooper of

18  Asia Alternatives outlining Asia LTI's new operation.  (Fanger Decl., ¶¶ 18 and 21.)  The

19  PowerPoint presentation attached to that e-mail is dated August 2007, a month in which Mr. Sun

20  was still an employee at Shoreline.  (Fanger Decl., ¶ 21.)  It  markets Mr. Sun's new business by

21  outlining substantial amounts of Shoreline's proprietary and confidential know-how and also

22  information on debt pricing that is based on Shoreline's Pricing Model.  (Id.) It contains false

23  statements about Mr. Sun's employment at Shoreline and includes a list of deals on the last page

24  that are deals from Shoreline's Potential Investment List which deals were sourced by Shoreline

25  _____

26      [8] Under the pretense of being employed by Shorline, although he was not employed at the time, Mr. Sun
    convinced Hurang District Supervisor Shuikang Sun to meet with him to discuss potential portfolio deals (with
27  another former Shoreline employee named Jianping Zhou)  After the meeting, Messrs. Zhou and Xiaobing Sun told
    Shuikang Sun that they were not with Shoreline anymore and handed him a business card with a different company's
28  name on it.

SHORELINE CAPITAL MANAGEMENT. LTD.'S MEMO SUPPORTING *EX PARTE* APPLICATION
FOR TRO AND OSC RE PRELIMINARY INJUNCTION AND EXPEDITED DISCOVERY ORDER

1   before Mr. Sun joined the firm. (Fanger Decl., ¶ 22.) The e-mail itself is a solicitation to Asia

2   Alternatives. (Fanger Decl., ¶ 18 and Ex. F (Shoreline's deal prospect list from the PowerPoint's

3   last page is Ex. H to the Fanger Decl.)

4

5       Together with Mr. Du, Mr. Sun solicited a meeting with Ms. Cooper in Beijing, and Ms.

6   Cooper actually met with Mr. Du as a result of that solicitation. (Fanger Decl., ¶ 19.)

7

8       On November 29, 2007 Mr. Sun e-mailed a substantially similar PowerPoint presentation

9   outlining the new operation of Asia LTI to the Washington State Investment Board (the WSIB),

10  an entity in the Unites States that has committed 20 million dollars with Shoreline and is one of

11  Shoreline's most important customers. (Fanger Decl., ¶ 20 and Ex. G.) The PowerPoint

12  presentation that Mr. Sun sent to the WSIB is dated August 2007, showing that it was developed

13  and used to contact Shoreline's customers even while Messrs. Sun and Du were still Shoreline

14  employees. (Fanger Decl., ¶ 21.) That PowerPoint presentation shows that the business model

15  on which Asia LTI is based stems largely or entirely from Shoreline's confidential and

16  proprietary financial model and other trade secrets. (Id.) It also includes a direct reference to a

17  confidential deal that Shoreline closed that bore the code name "#1233"; the "Portfolio Pricing"

18  process described in it is exactly the same as Shoreline's pricing process, as set forth in the

19  Shoreline Pricing Model; it identifies Messrs. Sun and Du as having been Portfolio Managers

20  when this was a title neither had obtained with Shoreline; and it lists a number of deals that were

21  developed at Shoreline and the existence of which was part of Shoreline's confidential

22  information. (Fanger Decl., ¶ 22.)

23

24      During a meeting with Shuikang Sun at Huarong's offices, Shoreline asset manager

25  Deguang Zheng (along with colleague Yan Wen) learned from Shuikang Sun that because he

26  believed Xiaobing Sun to be a member of Shoreline, he had allowed Xiaobing Sun to visit him at

27  Huarong's offices and to receive information on a 29-borrower portfolio of loans, on which

28  Xiaobing Sun proceeded to do due diligence as part of an attempt to close an investment

- 12 -

SHORELINE CAPITAL MANAGEMENT, LTD.'S MEMO SUPPORTING *EX PARTE* APPLICATION
FOR TRO AND OSC RE PRELIMINARY INJUNCTION AND EXPEDITED DISCOVERY ORDER

1   transaction for investors unrelated to Shoreline and unknown to Shoreline.  (Zheng Decl., ¶ 5;

2   Yang Decl., ¶ 4(1).)

3

4        Apparently, the due diligence done in Huarong's offices took about one week, and Mr.

5   Sun was joined in this work by Jianping Zhou who is a former employee of Shoreline.  (Zheng

6   Decl., ¶ 5.)  That due diligence was completed using Shoreline's laptop, financial models and

7   other analysis tools, which Xiaobing Sun still had at the time of the visit to Huarong.  And, as a

8   result of their work on this portfolio, Messrs. Sun and Du were paid a fee by the investor whom

9   they represented; that the investor bought the portfolio.  (Id., ¶ 6.)

10

11       A significant part of the models and reports used in the due diligence are the same as

12   Shoreline's financial models used in the acquisition of portfolio "#1233", which are Shoreline's

13   proprietary and confidential trade secrets.  (Zheng Decl., ¶ 7; Yang Decl., ¶¶ 4(4)-(5).)

14

15       A former employee of Shoreline named Feng Lin, who went to work for Asia LTI (Zhang

16   Decl., ¶ 7), has admitted to Shoreline that Mr. Sun, Mr. Du and two others participated in due

17   diligence on non-performing loans at both Huarong and Cinda.  These activities were conducted

18   under the Chinese name for Asia LTI, Rongteng Investment Co. (Yang Decl., ¶ 4(5).)  Further,

19   while working with Mr. Sun at Rongteng, Mr. Lin saw Mr. Sun keep Shoreline's financial

20   models, Excel spreadsheets and loan documents in his (or Shoreline's) laptop computer.  When

21   Mr. Lin saw those materials in the laptop, Mr. Sun had already left Shoreline and started working

22   for Rongteng.  (Zhang Decl., ¶ 7.)

23

24       Apparently, Mr. Sun even sent Shoreline's portfolio files, pricing materials and financial

25   analysis models to one of his friends working at Goldman Sachs in order to convince that friend

26   to join Rongteng.  (Zhang Decl., ¶6.)

27

28

- 13 -

SHORELINE CAPITAL MANAGEMENT, LTD.'S MEMO SUPPORTING *EX PARTE* APPLICATION
FOR TRO AND OSC RE PRELIMINARY INJUNCTION AND EXPEDITED DISCOVERY ORDER

1    And one of the smaller owners of Asia LTI, Jianping Zhou, has expressed the desire to

2  sell Shoreline's financial models, loan files from previous portfolios, and other proprietary and

3  trade secret information.  (Yang Decl., ¶ 4(5).)

4

5    In December 2007, two Shoreline limited partners notified Shoreline that Mr. Sun and

6  Mr. Du had contacted them.  Messrs. Sun and Du had become acquainted with these limited

7  partners while they were at Shoreline when these limited partners had visited Shoreline's

8  Guangzhou office.  In e-mails to one of Shoreline's limited partners, Mr. Sun claimed that he had

9  set up his own fund doing the same business as Shoreline.  (Zhang Decl., ¶5.)

10

11    On December 20, 2007, both Mr. Sun and Mr. Du claimed to be co-founders of Rongteng

12  Investment Co., or Asia LTI, in a Private Placement Memorandum they sent to Shoreline's

13  limited partners.  (Zhang Decl., ¶6.)

14

15    Shoreline believes that Messrs. Sun and Du have contacted numerous other investors

16  connected to Shoreline.  (Fanger Decl., ¶ 23.)

17

18  G.    Shoreline, Which, Upon Learning Of Mr. Sun's Activities, First Attempted To Dissuade

19        Him From Them, Is Now Being Hampered In Its Business By Interference From Asia LTI

20

21    Mr. Fanger met with Mr. Sun on December 5, 2007 to attempt to dissuade him from

22  continuing to disseminate Shoreline's confidential proprietary information, and to convince him

23  to adhere to the terms of his NDA and employment letter.  On that day, he informed Mr. Fanger

24  that he was competing in non-performing loans and distressed real estate in China, the exact

25  areas that he expressly agreed not to compete in when he signed the employment offer letter on

26  March 5, 2007.  He claimed that he should be allowed to compete since he felt he had been

27  essentially terminated by Shoreline.  But he admitted that Shoreline never told him he was

28  terminated and his e-mail to Mr. Gantt on November 29 confirms that he left of his own volition:

- 14 -

1  "Since I don't feel it's culture is a good fit for me working at Shoreline, I left before being

2  transformed into a formal employee, then I started a firm with a local lawyer."  (Fanger Decl., ¶

3  23 and Ex. G thereto.)

4

5  During the December 5, 2007 meeting Mr. Sun did not agree to cease his actions. Instead,

6  he tried to convince Mr. Fanger to join him in his new competing venture.  (Fanger Decl., ¶ 24.)

7

8  In the course of trying to induce Mr. Fanger to come to work for Asia LTI, Mr. Sun sent

9  Mr. Fanger an Excel spreadsheet that purported to articulate Asia LTI's financial model.  It was

10  identical to the confidential and proprietary Shoreline Pricing Model, except that in place of

11  Shoreline's name, Mr. Sun had added Asia LTI.  (Fanger Decl., ¶ 25.)

12

13  Because Mr. Fanger expressed doubts about Mr. Sun's ability to analyze and price assets,

14  in the meeting on December 5, 2007, Mr. Sun showed him financial models on Mr. Sun's

15  personal laptop that he stated he had used to price several portfolios for a Chinese investor.  He

16  stated he had been paid for this service by the Chinese investor.  (Later, after reading the

17  declaration of Shoreline employee Deguang Zheng in this case, Mr. Fanger realized that the

18  portfolio he was referring to was the same Huarong portfolio that was prepared in August with

19  Shoreline's models.)  In the course of opening Excel files on his laptop, Mr. Sun admitted to Mr.

20  Fanger that he used these files to do analysis on new distressed asset portfolios.  Mr. Fanger

21  viewed the details of the Excel files for upwards of ten minutes and saw that they contained the

22  same pricing techniques used in Shoreline's pricing of portfolio "#1233," which Mr. Sun was

23  involved with servicing while he was at Shoreline.  (Fanger Decl., ¶ 26.)

24

25  On January 6, 2008, Mr. Fanger called Valerie Cooper at Asia Alternatives to confirm

26  that she had been solicited by Mr. Sun.  (Fanger Decl., ¶ 27.)

27

28

- 15 -

1    On January 8, 2008, Mr. Fanger met with Mr. Sun to ask him one last time whether he

2    intended to stop his improper competition and use of Shoreline's confidential information.  Mr.

3    Sun indicated no such intention.  (Fanger Decl., ¶ 28.)

4

5    Shoreline is presently in the process of closing a fund.  As it heads for a first closing in

6    mid January 2008 and further closings in February and March, Mr. Sun's and Asia LTI's contacts

7    with Shoreline's investors and dissemination of Shoreline's trade secrets and confidential and

8    proprietary information, as well as its solicitations of its investors based on Shoreline's financial

9    model are interfering with Shoreline's ability to complete this important business.

10

11                                              III

12                                      LEGAL ANALYSIS

13

14    A.    Injunctive Relief Is Available Under The UTSA In California

15

16    Actual or even *threatened* misappropriation of trade secrets may be enjoined under

17    California law to eliminate the commercial advantage that would otherwise obtain from the

18    misappropriation.  California Civil Code §3426.2 (a); *Morlife, Inc. v. Perry*, 56 Cal. App. 4th

19    1514, 1528 (1997).  In fact, in appropriate circumstances, *affirmative acts* to protect a trade secret

20    may be compelled by court order.  California Civil Code §3426.2(c).  The UTSA neither defines

21    appropriate circumstances nor elaborates on the court order.  But a plaintiff in a UTSA action

22    may obtain injunctive relief prohibiting the *publication* of a trade secret if the court determines

23    that the plaintiff is likely to prevail on the merits and will suffer irreparable harm without the

24    injunction.  See *DVD Copy Ass'n Inc. v. Bunner*, 31 Cal. 4th 864, 875 and 889 (2003);

25    *ReadyLink Healthcare v. Cotton*, 126 Cal. App. 4th 1006, 1016-1026.

26

27

28

SHORELINE CAPITAL MANAGEMENT, LTD.'S MEMO SUPPORTING *EX PARTE* APPLICATION
FOR TRO AND OSC RE PRELIMINARY INJUNCTION AND EXPEDITED DISCOVERY ORDER

B.    <u>Shoreline Meets The Standards For Injunctive</u>

Injunctive relief is appropriate where the moving party can satisfy one of two legal standards. Under the first standard, the moving party must establish that: (1) it will suffer irreparable injury if injunctive relief is not granted; (2) it will likely prevail on the merits; (3) in balancing the equities, the non-prevailing party will not be harmed more than the moving party is helped by the injunction; and (4) granting the injunction will serve the public interest. *Stanley v. University of Southern California*, 13 F. 3d 1313, 1319 (9th Cir. 1994). Under the second standard, the moving party must demonstrate either (a) a combination of probable success on the merits and the possibility of irreparable injury, or (b) that serious questions are raised and the balance of hardships tips strongly in favor of the moving party. *Id.* The two standards represent "two points on a sliding scale." *Department of Parks & Rec. for State of Calif. v. Bazaar Del Mundo Inc.*, 448 F. 3d 1118, 1123 (9th Cir. 2006). The moving party must demonstrate a fair chance of success on the merits or at least raise questions serious enough to require litigation.

Shoreline can satisfy both standards and therefore should be granted temporary and preliminary injunctions prohibiting Mr. Sun from further use of the Shoreline Pricing Model and any other confidential information he obtained from Shoreline, such as its prospective asset/portfolio list, and prohibiting him from further solicitation of Shoreline's client investors, portfolio prospects, vendors and employees.

Shoreline satisfies all four elements of the first *Stanley* standard:

1.    <u>Shoreline Will Suffer Irreparable Injury If Injunctive Relief Is Not Granted</u>

Unless Mr. Sun is required immediately to return all copies of the Shoreline Pricing Model to Shoreline, and to cease all activities based on it, the value of the Pricing Model to Shoreline will be diminished as it becomes increasingly available to others. The competitive

- 17 -

1  edge that Shoreline worked so hard to establish and to protect with its Pricing Model will be
2  eroded.  The relationships that Shoreline has worked hard to establish with investors in the
3  United States and banks and investment managers in China will be harmed.  Shoreline's current
4  fund closing, for example, will continue to encounter unnecessary roadblocks.  And its
5  employees will continue to be solicited to join a firm by one who agreed in writing not to solicit
6  them, one who agreed to protect the information upon which he has established his competing
7  enterprise.  Indeed, the value of its NDAs and employment agreements will be undermined
8  unless it is able to enforce the present ones against Mr. Sun.
9

10      Shoreline has already been damaged and the damage is continuing, and on this basis
11  Shoreline intends to pursue Mr. Sun.  But its remedies at law are not sufficient to rectify Mr.
12  Sun's actions.  For many of Mr. Sun's actions, it would be impossible to determine damages with
13  any degree of certainty.  For example, the solicitation of Shoreline's customers based on a stolen
14  financial model must be stopped right away.  *Merrill Lynch, Pierce, Fenner & Smith, Inc. v.*
15  *Bradley*, 756 F. 2d 1048, 1054 (4th Cir. 1985); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v.*
16  *Stidham*, 658 F. 2d 1098, 1102 (5th Cir. 1981).  It would be difficult to determine Shoreline's
17  loss of profits and loss of new business if the NDA and employment agreement letter were not
18  enforced.  And it is impossible to determine the number of client investors, customers,
19  prospective deals, vendors and employees Mr. Sun will pursue if not restrained.  Given ever
20  changing conditions in the marketplace, the profits Shoreline would have realized from these
21  missed opportunities would be hard to quantify.
22

23      Shoreline's investors have entrusted it with confidential information concerning
24  significant investments in this unique area.  Shoreline is obliged to protect the trust reposed in it
25  and the information divulged to it, but the value of the damage to its relationships absent
26  injunctive relief would also be hard to quantify.
27
28

SHORELINE CAPITAL MANAGEMENT, LTD.'S MEMO SUPPORTING *EX PARTE* APPLICATION
FOR TRO AND OSC RE PRELIMINARY INJUNCTION AND EXPEDITED DISCOVERY ORDER

1   The stability of Shoreline's offices in China is threatened by Mr. Sun's approaches.

2   Unless Mr. Sun is enjoined, Shoreline will suffer irreparable harm as it is threatened with future

3   employee defections. Because Shoreline devotes time, money and energy to its employees,

4   particularly to developing the know-how required to operate in this specialized financial field

5   (just as it did with Mr. Sun and Mr. Du), each lost employee represents a serious blow.

6

7       2.    Shoreline Is Likely to Prevail On The Merits

8

9   That Shoreline is likely to prevail on the merits of its claims is not subject to serious

10  challenge. Mr. Sun's conduct constitutes breaches of his contract with Shoreline, the

11  misappropriation and conversion of its trade secrets, conversion, unfair competition, intentional

12  interference with its prospective economic advantage and interference with its existing contracts,

13  unjust enrichment, breach of the duty of loyalty that Mr. Sun owed to Shoreline, and violations of

14  the California Penal Code.

15

16  What is more, under California law, a restrictive covenant is enforceable if it is necessary

17  to protect confidential information or trade secrets. *Hollingsworth Solderless Terminal Co. v.*

18  *Turley*, 622 F. 2d 1324, 1338 (9th Cir. 1980); *Muggill v. Reuben H. Donnelley Corp.*, 62 Cal. 2d

19  239, 243 (1965); *Gordon v. Landau*, 49 Cal. 2d 690 (1958); *Gordon v. Wasserman*, 153 Cal.

20  App. 2d 328 (1957).[9]

21

22  Stated another way, there is a judicially created exception to California Business &

23  Professions Code §16600 where a former employee utilizes a former employer's trade secrets or

24  otherwise engages in unfair competition. Under such circumstances, it is appropriate for courts

25

26  [9] California Business & Professions Code §16600 provides that "every contract by which anyone is
    restrained from engaging in a lawful profession, trade or business of any kind is to that extent void." This provision
27  has been construed by the California Supreme Court as invalidating restrictive covenants *unless* their enforcement is
    necessary to protect confidential information or trade secrets. *Muggill v. Reuben H. Donnelley Corp.*, 62 Cal. 2d
28  239, 243 (1965).

- 19 -

SHORELINE CAPITAL MANAGEMENT, LTD.'S MEMO SUPPORTING *EX PARTE* APPLICATION
FOR TRO AND OSC RE PRELIMINARY INJUNCTION AND EXPEDITED DISCOVERY ORDER

1  to enforce a restrictive covenant prohibiting the solicitation of clients and misuse of confidential

2  information.  In this case, not only has Mr. Sun taken Shoreline's Pricing Model and other

3  confidential information, but he has used it as a basis for the establishment of his own competing

4  enterprise, and he has used what he has unlawfully obtained to solicit Shoreline's investors, the

5  bankers and investment managers from whom it obtains its loan portfolios, and even its

6  employees, including its key employees.  Thus, in addition to injunctive relief requiring Mr. Sun

7  to cease all use of the Shoreline Pricing Model, Shoreline is entitled to additional injunctive

8  relief prohibiting Mr. Sun from pursuing Shoreline's investors, vendors and employees.

9

10        There can be no question that the Shoreline Pricing Model constitutes trade secret

11  information.[10]  In determining whether information is a trade secret, courts take into

12  consideration the following factors: (1) the extent to which the information is known outside the

13  employer's business; (2) the extent of measures taken by the employer to guard the secrecy of the

14  information; (3) the amount of effort or money expended by the employer in developing the

15  information; and (4) the ease or difficulty with which the information could be properly acquired

16  or duplicated by others.  *American Paper & Packaging Products, Inc. v. Kirgan*, 183 Cal. App.

17  3d 1318, 1324 (1986).

18

19        In this case, nothing like the Shoreline Pricing Model was known outside Shoreline.

20  Indeed, the business Shoreline's principals developed around their pricing model is new and

21  unique.  Because Shoreline had devoted considerable resources to developing its Pricing Model,

22  including several years, hundreds of hours and many hundreds of thousands of dollars, and

23  because it was unique and capable of producing substantial profit for its owners, Shoreline took

24  serious measures to protect it from disclosure.  These included having prospective employees and

25  others with whom it dealt in business sign NDAs, having employees sign employment

26

27        [10] In 1984, California codified the Uniform Trade Secrets Act (UTSA) in Civil Code §3426, *et seq*.  The

28  UTSA expressly provides for the issuance of injunctions to maintain the sanctity of a "trade secret."  California Civil
      Code §3426.2 (a).  A "trade secret" is defined at California Civil Code §3426.1 (d).

- 20 -

agreements, and promulgating and disseminating policies through Employment Handbooks, all articulating Shoreline's concerns about protecting its valuable trade secrets. No one can say whether Messrs. Sun and Du ultimately could have developed a similar model on their own; but even if they had had the concept, experience, capital and specialized knowledge required, they certainly could not have done it in the brief period since they began working at Shoreline in early 2007. The Shoreline Pricing Model could only have been acquired from Shoreline — indeed there is powerful evidence that Mr. Sun took it directly from Shoreline — and it was not for sale by Shoreline.

California has afforded trade secret protection to an employer's customer list and information where a former employee has joined a competitor. For example, *Morlife, Inc. v. Perry*, 56 Cal. App. 4th 1514 (1997), affirmed the trial court's issuance of a permanent injunction restraining the defendants from doing business with any of the entities who transferred their business to the defendants after being unlawfully solicited:

> [The] customer list was "a compilation developed over a period fo years, of names
> addresses, and contact persons, containing pricing information and knowledge
> about particular roofs and roofing needs of customers using its services: as such, it
> has independent economic value . . . [and the plaintiff] made reasonable efforts to
> maintain the secrecy of its customers' identity by limiting circulation of its
> customer lists and by advising employees through an independent employment
> agreement and an employee handbook, that [the plaintiff] considered the
> information valuable and confidential.

In using the Shoreline Pricing Model, Mr. Sun did not even need a customer list in tangible form. He could merely look up Shoreline's key investors and vendors and pretend that he had independently developed a formulation like Shoreline's. There is clear evidence that Mr.

SHORELINE CAPITAL MANAGEMENT, LTD.'S MEMO SUPPORTING *EX PARTE* APPLICATION
FOR TRO AND OSC RE PRELIMINARY INJUNCTION AND EXPEDITED DISCOVERY ORDER

Sun misappropriated Shoreline's trade secret and then used it in a way that was again violative of the UTSA. California Civil Code §3426.1 (b).

Having signed the NDA and employment agreement letter with Shoreline, and having received and presumably read the Employment Handbook, Mr. Sun knew that he was prohibited from using the Shoreline Pricing Model outside the scope of his employment, and he knew that to take it and use it as a basis for a new and competing firm would fly in the face of all of those materials. He knew that the Shoreline Pricing Model was unknown to others and that it would impart to him and to Mr. Du an economic advantage to which they were not entitled. *Morlife, Inc. v. Perry*, 56 Cal. App. 4th at 1520.

3.    The Balance Of Equities Favors Shoreline's Request For Injunctive Relief

A balancing of the equities favors the issuance of an injunction in favor of Shoreline. The injunctive relief it seeks would do no more than require Mr. Sun to adhere to his agreements with Shoreline which he entered into when he was recruited by and when he began his employment with Shoreline. The commitments and promises he made in those agreements permitted him to have access to Shoreline's confidential and proprietary trade secret information, particularly its Pricing Model; had he not executed those agreements, he would not have gained access to that information and material.

Shoreline does not seek to keep Mr. Sun from working in the financial industry in the United States, China or anywhere else. It does, however, seek to prevent him from using its confidential and proprietary trade secret information as a basis upon which to develop his fledgling enterprise, Asia LTI, and from obtaining the patronage of Shoreline's customers and vendors in the same highly specialized financial area through the use of the Shoreline Pricing Model and other confidential and proprietary information that belongs to Shoreline.

1    Mr. Sun has deliberately chosen to disregard his agreements with Shoreline as well as its

2    policies as set forth in the relevant terms of its Employment Handbook, and to engage in other

3    actionable conduct.  He has misappropriated Shoreline's information and materials, he has

4    arranged meetings with its customers on the pretext that he was still employed by Shoreline, he

5    has solicited its employees in the United States and China , and he has obtained unauthorized

6    access to Shoreline's computer system.  Having hired Mr. Sun to work in the specific field of

7    investing in distressed debt in China, having trained Mr. Sun to work in that field, and having

8    revealed to him the materials and information that enable that business – which Shoreline's

9    principals spent considerable resources to develop – it would be unjust and inequitable for Mr.

10    Sun to continue to benefit from his deliberate disregard of his contractual and legal obligations.

11

12    In addition, permitting Mr. Sun to profit from his breach of the agreements he entered

13    into with Shoreline would encourage other Shoreline employees, who have signed similar or

14    identical agreements, to disregard the obligations set forth in those agreements with impunity.

15    Such employees would have an incentive to use Shoreline's confidential and proprietary

16    information to compete with Shoreline to its detriment and to their personal advantage.

17

18    4.    Granting An Injunction Will Serve The Public Interest

19

20    An injunction – temporary, preliminary or permanent -- would require Mr. Sun to return

21    intellectual property to its rightful owner and to abide by his contractual and statutory

22    obligations.  An injunction would uphold Shoreline's rights, protect the sanctity of its contracts,

23    preserve the confidentiality of information provided by customers in confidence, and promote

24    fair and vigorous competition.  See *Merrill Lynch, Pierce, Fenner & Smith v. Kramer*, 816 F.

25    Supp. 1242, 1249 (N.D. Ohio 1992).

26

27    Under the second *Stanley* standard, the moving party must demonstrate either (a) a

28    combination of probable success on the merits and the possibility of irreparable injury or (b) that

- 23 -

1  serious questions are raised and the balance of hardships tips strongly in favor of the moving

2  party. *Stanley v. University of Southern California*, 13 F. 3d at 1319. "Serious questions" means

3  questions that involve a fair chance of success on the merits that cannot be resolved one way or

4  the other at the hearing on the injunction, "and as to which the court perceives the need to

5  preserve the status quo lest one side prevent resolution of the questions or execution of any

6  judgment by altering the status quo." *Republic of Philippines v. Marcos*, 862 F. 2d 1355, 1362

7  (9th Cir. 1988); See also *Bay Area Addiction Research & Treatment, Inc. v. City of Antioch*, 179

8  F. 3d 725, 732 (9th Cir. 1999). If Shoreline can show that there are serious questions worthy of

9  litigation that might be rendered moot without injunctive relief, it should obtain that relief.

10

11     Shoreline is very likely to prevail on the merits. And unless Shoreline's Pricing Model

12  and other confidential information such as its deal list are returned to it, it will suffer the

13  following irreparable injuries, among others: (a) theft by a competitor of its confidential and

14  trade secret information, including particularly its financial model, the very core of its business

15  operation; (b) loss of confidentiality of its confidential and trade secret information, including its

16  financial model and its prospective asset/portfolio deals; (c) loss of Shoreline's express

17  contractual right not to have Mr. Sun leave Shoreline and enter into competition with it in

18  precisely the same field; (d) loss of an incalculable amount of future patronage from investors in

19  the United States who, as a result of solicitations from Mr. Sun and Asia LTI, will elect to do

20  business with that firm instead of with Shoreline; (e) loss of an incalculable amount of future

21  patronage from banks and investment management companies in China from whom Shoreline

22  acquires its loan portfolios; (f) loss of the full and fair opportunity to compete with Mr. Sun and

23  Asia LTI, in view of Mr. Sun's and Asia LTI's solicitations of Shoreline's investors, bankers and

24  investment management company contacts, all on the basis of the Shoreline Pricing Model; (g)

25  damage to the stability of Shoreline's offices and operations both in China and the United States,

26  and a threatened future loss of personnel if it became apparent that Shoreline's NDAs and

27  employment agreements, like those it entered into with Mr. Sun, will not be enforced; and (h)

28

- 24 -

SHORELINE CAPITAL MANAGEMENT, LTD.'S MEMO SUPPORTING *EX PARTE* APPLICATION
FOR TRO AND OSC RE PRELIMINARY INJUNCTION AND EXPEDITED DISCOVERY ORDER

1   risks to the security and integrity of Shoreline's computer system if Mr. Sun or anyone from Asia

2   LTI gained further unauthorized access to it.

3

4       Shoreline also raises very serious questions, and if the status quo of its enterprise is not

5   preserved, some of those questions will be moot by the time they are decided at trial.  In short,

6   Shoreline satisfies all of the *Stanley* factors and should be granted injunctive relief.

7

8                                          IV

9                                      CONCLUSION

10

11       Mr. Sun entered into the NDA and employment agreement simultaneously understanding

12   the limitations they placed on him concerning Shoreline's trade secrets and intending to use that

13   information for his own competing operation.  While he was at Shoreline, he did everything he

14   could to develop the know-how, contacts and other information he would need to set up that

15   competing concern.  And before he left, he started that business with Mr. Du.

16

17       He started by taking Shoreline's Pricing Model and Potential Investment List and using

18   these to solicit Shoreline's investment customers, vendors and employees, including its partners.

19   Without this valuable trade secret information, he could not have started Asia LTI.  In short he,

20   Mr. Du and others are unjustly profiting from Shoreline's assets.  And they should be prohibiting

21   from doing so any further.  Accordingly, Shoreline is entitled to temporary and preliminary

22   injunctive relief.

23

24       DATED:  January 11, 2008.                    COMMINS & WEBSTER
                                                      Professional Corporation
25

26

27                                           By:  /David H.S. Commins/
                                                  David H.S. Commins
28                                                Attorneys for Plaintiff
                                                  Shoreline Capital Management, Ltd.

- 25 -

SHORELINE CAPITAL MANAGEMENT, LTD.'S MEMO SUPPORTING *EX PARTE* APPLICATION
FOR TRO AND OSC RE PRELIMINARY INJUNCTION AND EXPEDITED DISCOVERY ORDER