1    David H.S. Commins (CSBN 124205)
     Kenneth C. Webster  (CSBN 179058)
2    COMMINS & WEBSTER, P.C.
     400 Montgomery Street, Suite 200
3    San Francisco, CA 94104
     Tel (415) 391-6490
4    Fax (415) 391-6493
     david@commins.com
5    ken@commins.com

6    Attorneys for Plaintiff
     Shoreline Capital Management, Ltd.
7

8                    UNITED STATES DISTRICT COURT

9                    NORTHERN DISTRICT OF CALIFORNIA

10                        SAN JOSE DIVISION

11
                                              JW CV 08 0121
12   SHORELINE CAPITAL MANAGEMENT,
     LTD., a British Virgin Islands company
13   limited by shares,,                      No.

14          Plaintiff,                        SHORELINE CAPITAL MANAGEMENT,
                                              LTD.'S *EX PARTE* APPLICATION FOR
15          vs.                               TRO AND OSC RE PRELIMINARY
                                              INJUNCTION, AND FOR ORDER
16   XIAOBING SUN, an individual, also known  GRANTING LEAVE TO CONDUCT
     as DANIEL SUN,                           EXPEDITED DISCOVERY
17
            Defendant.
18   _____ /

19

20

21

22

23

24

25

26

27

28

     SHORELINE CAPITAL MANAGEMENT, LTD.'S *EX PARTE* APPLICATION FOR TRO AND OSC RE
              PRELIMINARY INJUNCTION AND FOR EXPEDITED DISCOVERY ORDER

1    Shoreline Capital Management, Ltd. (Shoreline) hereby applies to the Court for a

2    Temporary Restraining Order and Order to Show Cause re Preliminary Injunction, and for an

3    Order Granting Leave to Conduct Expedited Discovery.

4

5    1.    Shoreline is a British Virgin Islands company limited by shares with its

6    principal place of business in Guangzhou, China that conducts business in China through its

7    wholly owned subsidiary, Shoreline Capital Consulting (Shenzhen) Co., Ltd. (Shoreline

8    (Shenzhen)).  Shoreline is a private investment firm that manages assets for institutional

9    investors through investments in distressed assets in China.  All of its investors are in the United

10   States and some of its largest investors are in San Francisco.  (Accompanying Declaration of

11   Benjamin Fanger, ¶¶ 2-4.)

12

13   2.    Shoreline has a unique business model.  Its primary asset is a particular financial

14   model (the Shoreline Pricing Model) that took three and one-half years to develop, including

15   many hundreds of hours by skilled and experienced financial people and hundreds of thousands

16   of dollars.  It has used this single model to invest over 76 million dollars in loans with principal

17   balances of over 1.5 billion dollars.  All of its deals are based on this financial model, which is

18   articulated in the form of an Excel spreadsheet.  (Fanger Decl., ¶¶ 2-4.)

19

20   3.    Shoreline employs over 25 people who work mostly in China with its wholly

21   owned subsidiary, Shoreline (Shenzhen)[1], but two of whom work principally in Campbell,

22   California.  (Fanger Decl., ¶ 2.)  Most have executed non-disclosure agreements (NDAs) and, as

23   part of their employment agreements, have countersigned employment agreement letters.  In

24   those letters they have agreed not to resign and, within a period of two years following their

25   departure from Shoreline, compete with Shoreline in the non-performing loan or distressed real

26

27   [1] Guangzhou United (GU) is the onshore agent of Shoreline Shenzhen and officially employees Shoreline

28   Shenzhen's workers.  GU's agency contract with Shoreline Shenzhen is for the sole purpose of employing Shoreline
personnel and it is 100% funded by Shoreline.  (See, for example, Declaration of Linlin Gong, ¶ 1.)

SHORELINE CAPITAL MANAGEMENT, LTD.'S MEMO SUPPORTING *EX PARTE* APPLICATION
FOR TRO AND OSC RE PRELIMINARY INJUNCTION AND EXPEDITED DISCOVERY ORDER

estate investment area in China.  And all of these employees have agreed to keep strictly confidential all corporate documents, files, business-secrets and know-how.  (Fanger Decl., ¶ 5.) What is more, all of Shoreline's employees, including Mr. Sun, have received the Employment Handbook.  (Fanger Decl., ¶¶ 5 and 13; Declaration of Weihong Ye, ¶ 3; Declaration of Yonghui Wu, ¶ 3; Declaration of Wei Wang, ¶ 3; Declaration of Linlin Gong, ¶ 3.)

4.    Shoreline included strong confidentiality language in its Employment Handbook to give notice of the highly confidential nature of its proprietary information to its employees. (Fanger Decl., ¶ 5.)  It requires employees to avoid conduct that could harm the company and prohibits use of Shoreline's name except when doing business for Shoreline:

> Article 8: Employee Conduct: Employees should use professional judgment and avoid any conduct that violates or potentially harms the best interests of the Company.  Without prior approval, employees must only use the Company's name or their titles when doing business for the Company.

The Employment Handbook also requires employees to maintain the confidentiality of Shoreline's proprietary and trade secret information:

> Article 9: Confidentiality: Employees shall follow and implement the Company's confidentiality rules at all times.  All information obtained by employees, including, but not limited to, asset/portfolio information, debtor information, asset servicing strategies, debt collection status, models and forms of any kind used by the Company, investment return models, evaluation models and all other related information cannot be revealed to persons outside the team, including any other employees within the Company that are not directly related to the cases in which the information is used.  [A translation (from Mandarin) of these portions of the Handbook is attached as Ex. D to the Fanger Decl.]

SHORELINE CAPITAL MANAGEMENT, LTD.'S MEMO SUPPORTING *EX PARTE* APPLICATION
FOR TRO AND OSC RE PRELIMINARY INJUNCTION AND EXPEDITED DISCOVERY ORDER

1    5.    Over the last four years, Shoreline has developed relationships with sellers of

2    distressed assets in China.  In particular, it has developed close relationships with each of the

3    four state-owned asset management companies that are the only institutions permitted to sell

4    distressed debt at a discount in China.  Two of these, Huarong Asset Management Company

5    (Huarong) and Cinda Asset Management Company (Cinda), are particularly inclined to work

6    with Shoreline because Shoreline has purchased multiple portfolios from each of them.  As part

7    of its deal sourcing activities, Shoreline has set up a deal sourcing team that has created a list of

8    potential portfolios for investment (Potential Investment List).  (Fanger Decl., ¶ 4.)

9

10    6.    Shoreline's owners have always considered the Shoreline Pricing Model, the

11    Potential Investment List and other company documents to be highly confidential proprietary

12    trade secrets.  Because they are the primary tools in its business, the owners have always closely

13    guarded them and have required confidentiality agreements to be signed by any person that was

14    shown the documents.   (Fanger Decl., ¶ 5.)  Most, if not all of those working at Shoreline or

15    Shoreline Shenzhen fully understood the importance of maintaining the secrecy of Shoreline's

16    proprietary information, as well as the efforts that Shoreline's owners and managers undertook to

17    maintain that secrecy.  (Gong Decl., ¶¶ 3-5; Wu Decl., ¶¶ 3 and 4; Wang Decl., ¶¶ 3-5;

18    Declaration of Linyu Yang, ¶ 2.)

19

20    7.    Shoreline found Mr. Sun when he was a graduate student at the University of

21    Chicago and Mr. Fanger, who is a principal of Shoreline, began to recruit him in this District

22    where he, Mr. Sun, resided.  (Mr. Sun was attending weekend classes in Chicago.)  (Fanger

23    Decl., ¶ 6.)  All interviews and meetings between Mr. Sun and Shoreline during the recruiting

24    process were conducted in or near Campbell, California.  (Fanger Decl., ¶¶ 6 and 7.)

25

26    8.    On or about January 26, 2007, while Shoreline was recruiting Mr. Sun, it asked

27    him to sign a standard NDA and he did so.  (Fanger Decl., ¶ 7.)  The NDA stated that Shoreline

28    would provide valuable information to Mr. Sun:

SHORELINE CAPITAL MANAGEMENT, LTD.'S MEMO SUPPORTING *EX PARTE* APPLICATION
FOR TRO AND OSC RE PRELIMINARY INJUNCTION AND EXPEDITED DISCOVERY ORDER

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

> [T]he Company has agreed to provide certain information to the Interested Party
> concerning the opportunity, which information includes certain confidential and
> proprietary information that is valuable to the Company, and is the exclusive
> property of the Company.

In exchange for receiving this valuable confidential information, Mr. Sun agreed that all non-public information he received from Shoreline would be deemed confidential:

> All information, documents and other communications furnished by the Company
> to the Interested Party ("Proprietary Information") shall be deemed confidential.
> Proprietary Information shall not include any information which becomes
> generally available to the public other than as a result of disclosure by the
> Interested Party in breach of this Agreement, information already in the Interested
> Party's possession or information from a source not known to be bound by an
> Agreement.

And Mr. Sun agreed not to disclose any confidential information he received:

> Unless otherwise agreed to in writing by the Company or as may be required by
> law or legal process, neither the Interested Party nor any of its affiliates or
> representatives will use, disclose or reveal any Proprietary Information for any
> purpose other than in direct connection with assessing the potential employment
> opportunity with the Company.  [A copy of the NDA is Ex. A to the Fanger Decl.]

9.      While Shoreline was recruiting Mr. Sun, but after he had signed the NDA, it disclosed to him the details of the Shoreline Pricing Model.  This was consistent with Shoreline's normal business practice; it has never knowingly shown the Shoreline Pricing Model to anyone

- 4 -

SHORELINE CAPITAL MANAGEMENT, LTD.'S MEMO SUPPORTING *EX PARTE* APPLICATION
FOR TRO AND OSC RE PRELIMINARY INJUNCTION AND EXPEDITED DISCOVERY ORDER

1   who was not first made aware that it constituted confidential and proprietary information that

2   was not to be disclosed outside Shoreline.  (Fanger Decl., ¶¶ 5 and 8.)

3

4        10.     Following the recruiting process, Shoreline offered Mr. Sun a job as a Portfolio

5   Manager in Training.  Its offer to him was memorialized in a March 1, 2007 letter.  (Fanger

6   Decl., ¶ 9 and Ex. B.)  That letter explained that Mr. Sun would be located in Shoreline's

7   Guangzhou office with its subsidiary, Shoreline (Shenzhen).  It set forth the areas of business he

8   would be expected to learn and master.  It specified that he would not resign to compete with

9   Shoreline and that he would keep confidential the company's proprietary and trade secret

10  information:

11

12        You hereby also agree to not resign to compete or work for any competitor

13        involved in non-performing loan[s] or distressed real estate investment[s] in

14        China for a period of two years following your departure from Shoreline unless

15        agreed to in writing by the company.  You also agree to keep strictly confidential

16        all corporate documents, files, business secrets and know-how.

17

18  Mr. Sun countersigned this letter on March 5, 2007 and promptly delivered a copy of it to Mr.

19  Fanger in Campbell, California. (Fanger Decl., ¶ 9.)  Mr. Sun started working at Shoreline on

20  March 28, 2007 and has not formally resigned or been fired.  (Declaration of Xiaolin Zhang, ¶ 2.)

21

22        11.     Mr. Fanger also recruited Qiang Du from the University of Chicago.  While

23  Shoreline was recruiting Mr. Du, it asked him to sign a standard NDA and he did so on March

24  13, 2007.  (Fanger Decl., ¶ 8.)  Following the recruitment process, Shoreline also offered Mr. Du

25  a job as a Portfolio Manager in Training, and Mr. Du also signed an Offer Letter just as Mr. Sun

26  had done.  (Fanger Decl., ¶ 10 and Ex. C.)

27

28        12.     By their terms, both Offer Letters were to serve as employment agreements and

- 5 -

each also included confidentiality and non-compete provisions.  (Fanger Decl., ¶ 11.)  Shoreline included non-compete provisions in the agreements precisely because neither Mr. Sun nor Mr. Du had prior work experience in the fund management business, and Shoreline wanted to avoid the possibility that it would spend time and money providing them with proprietary know-how only to have them leave and use that knowledge to compete directly with Shoreline.  (Id., ¶ 12.)

13.      Shortly after Mr. Sun executed the employment agreement letter, he began working for Shoreline mostly in Guangzhou, China.  He received a copy of the Employment Manual and was informed that he was obliged to become familiar with its contents, and the company lent to Mr. Sun a company-owned laptop onto which he copied many confidential and proprietary files in the course of his work at Shoreline.  (Fanger Decl., ¶ 13.)

14.      In the course of his employment, Mr. Sun was permitted to view and became familiar with Shoreline's business model and the Shoreline Pricing Model on which it was based, and was introduced to its most important investors in the United States, as well as to bankers and asset management companies in China from whom Shoreline acquires loan portfolios.  He also became familiar with its employees, and he was allowed to become familiar with Shoreline's actual and prospective asset/portfolio deals and customers in China.

15.      Between March and July 2007, Mr. Sun worked for Shoreline.  Then, at the end of July he purportedly left for vacation, though he never returned.  On a Sunday in early August, Mr. Fanger had lunch with Mr. Sun in Guangzhou, China.  During the lunch Mr. Sun informed Mr. Fanger that he was considering leaving the company.  Mr. Sun asked Mr. Fanger if he wanted to terminate Mr. Sun.  Mr. Fanger informed Mr. Sun that Shoreline did not want to terminate him and hoped he would stay, provided he come back from vacation leave and do his best to achieve the seven job requirements outlined in the Offer Letter.  Mr. Fanger also asked him what he would do if he did leave Shoreline and Mr. Sun stated he would probably do some kind of investment business work.  Mr. Fanger told him that if he did so, Mr. Fanger would be

- 6 -

1    happy to source capital for his deals as long as they were not within the distressed asset market in

2    which he had agreed not to compete.  (Fanger Decl., ¶ 15.)

3

4        16.    Instead of returning to Shoreline, Mr. Sun and Mr. Du set up a new company

5    called Asia Long Term Investment, or Asia LTI (or Rongten Investment Co. in Chinese), in

6    Guangzhou, China, where Shoreline has its headquarters.  Asia LTI was designed to do precisely

7    the same business as Shoreline in the distressed debt market, precisely the same field in which

8    Shoreline operates, in the same geographic market.  (Mr. Du did not leave Shoreline until

9    September 2007, but began to work with Mr. Sun to set up Asia LTI before that time.)

10

11        17.    It has become clear now that during much of the time Mr. Sun was working at

12    Shoreline, he was planning and developing the beginnings of a competing business.  During his

13    tenure at Shoreline, Mr. Sun asked to be introduced to the presidents the Chinese state-owned

14    asset management companies from whom Shoreline acquires its loan portfolios.  He even

15    suggested that one of Shoreline's partners travel with him to meet these executives.  He also

16    asked to be trained regarding U.S. dollar repatriation issues which would be key to setting up a

17    similar investment fund.  No other employees in Shoreline had ever asked to do these things.

18    This behavior was strange for a new employee who knew little about the non-performing loan

19    business. (Zhang Decl. ¶2.)  Mr. Sun often asked other Shoreline staff for information, data and

20    contacts that he had no use for unless he intended to raise his own investment fund.  For

21    example, he repeatedly asked Mr. Fanger and others for a copy of Shoreline's new fund's Private

22    Placement Memorandum.  (Fanger Decl., ¶ 14; Zhang Decl. ¶ 3.)  He also discussed the

23    formation of a competing business with one of Shoreline's senior asset managers, Yonghui Wu.

24    While Mr. Sun was an employee at Shoreline, he told several employees that it would be easy for

25    him to raise a similar fund and source deals in China. (Zhang Decl. ¶3.)  On July 17, 2007 Mr.

26    Sun suggested to a Shoreline partner that he should be in charge of communication with sellers,

27    investors, limited partners and co-investors in Shoreline.  (All these responsibilities would be key

28    to setting up a fund like Shoreline's. (Id., ¶4.)  Indeed, in September 2007, he told employees at

Shoreline that, together with a Beijing lawyer, he was preparing to purchase an asset portfolio from Cinda.  (Yang Decl., ¶ 4(2)-(3).)  Mr. Wu relates the following telephone conversation from July 2007 (while Mr. Sun was still employed by Shoreline):

> Mr. Sun: "Yonghui, It's my feeling that people in favorable circumstances don't take risks, am I right?"

> Mr. Wu: "What? I'm in the subway, I'm not sure I understand you."

> Mr. Sun: "What I mean is, you're the person in charge of the "#1233" portfolio, so you wouldn't be willing to start a competing business, would you?"

> Understanding him to have the intent that Mr. Wu join him to start a competing business, Mr. Wu answered: "I don't think that being in charge of portfolio "#1233" constitutes favorable circumstances.  But since I took on the responsibility of managing it, I'm certainly going to stick to it."

> Mr. Sun: "Oh, well then, we'll have to talk later.  Goodbye."

> Mr. Wu: "Goodbye."

> [Wu Decl., ¶ 5.] [2]

---

[2] District Courts can rely on hearsay evidence at the temporary restraining order or preliminary injunction stage of litigation.  *Republic of the Philippines v. Marcos*, 862 F. 2d 1355, 1363 (9th Cir. 1988); *Michaels v. Internet Entertainment Group*, 5 F. Supp. 2d 823, 832 n.2 (C.D. Cal. 1998).

- 8 -

18.     Operating as Asia LTI, a company that is not yet registered to do business in China, Mr. Sun and Mr. Du began to contact Shoreline's investors in this District and other locations in the U.S. as well as bankers and asset managers in China who are among Shoreline's most important contacts.  (Declaration of Deguang Zheng, ¶¶ 2-4[3]; Declaration of Haiqiang Huang, ¶¶ 2 and 3[4]; Declaration of Yan Wen, ¶¶ 2 and 3.)[5]

19.     Messrs. Sun and Du also attempted to recruit employees from Shoreline to come to work for Asia LTI, including senior asset manager Yonghui Wu (Fanger Decl., ¶ 17 and Ex. E; Wu Decl., ¶ 5.), and asset manager Haiqiang Huang.  (Huang Decl., ¶ 3.)

20.     And up until September 18, 2007, when they were establishing Asia LTI, and despite Shoreline's requests for him to return it, Mr. Sun kept Shoreline's laptop computer that held its confidential and trade secret information.  (Fanger Decl., ¶ 16; Yang Decl. ¶ 3.)

21.     By e-mail and other means, Mr. Sun has solicited other investors in Shoreline in the United States, including Asia Alternatives in San Francisco.  Asia Alternatives is a fund of funds that has committed to invest 15 million dollars in Shoreline's presently open fund, as well as an additional 10 million dollars from the California Public Employees' Retirement System, one of Shoreline's most important investors, and others.  (Fanger Decl., ¶ 18; Zhang Decl., ¶ 5.)

---

[3] Mr. Sun contacted people at Hurang, a very important sourcing client for Shoreline and attempted to convince them not to speak to anyone at Shoreline other than himself, even though he was no longer an employee of Shoreline at the time.

[4] Mr. Sun contacted Cinda, a very important sourcing client for Shoreline and attempted to acquire a portfolio of loans from it.

[5] Under the pretense of being employed by Shorline, although he was not employed at the time, Mr. Sun convinced Hurang District Supervisor Shuikang Sun to meet with him to discuss potential portfolio deals (with another former Shoreline employee named Jianping Zhou)  After the meeting, Messrs. Zhou and Xiaobing Sun told Shuikang Sun that they were not with Shoreline anymore and handed him a business card with a different company's name on it.

SHORELINE CAPITAL MANAGEMENT, LTD.'S MEMO SUPPORTING *EX PARTE* APPLICATION FOR TRO AND OSC RE PRELIMINARY INJUNCTION AND EXPEDITED DISCOVERY ORDER

22.     On November 11, 2007, Mr. Sun sent a PowerPoint presentation to Valerie Cooper of Asia Alternatives outlining Asia LTI's new operation.  (Fanger Decl., ¶¶ 18 and 21.) The PowerPoint presentation attached to that e-mail is dated August 2007, a month in which Mr. Sun was still an employee at Shoreline.  (Fanger Decl., ¶ 21.)  It  markets Mr. Sun's new business by outlining substantial amounts of Shoreline's proprietary and confidential know-how and also information on debt pricing that is based on Shoreline's Pricing Model.  (Id.) It contains false statements about Mr. Sun's employment at Shoreline and includes a list of deals on the last page that are deals from Shoreline's Potential Investment List which deals were sourced by Shoreline before Mr. Sun joined the firm.  (Fanger Decl., ¶ 22.)  The e-mail itself is a solicitation to Asia Alternatives.  (Fanger Decl., ¶ 18 and Ex. F (Shoreline's deal prospect list from the PowerPoint's last page is Ex. H to the Fanger Decl.)

23.     Together with Mr. Du, Mr. Sun solicited a meeting with Ms. Cooper in Beijing, and Ms. Cooper actually met with Mr. Du as a result of that solicitation.  (Fanger Decl., ¶ 19.)

24.     On November 29, 2007 Mr. Sun e-mailed a substantially similar PowerPoint presentation outlining the new operation of Asia LTI to the Washington State Investment Board (the WSIB), an entity in the Unites States that has committed 20 million dollars with Shoreline and is one of Shoreline's most important customers.  (Fanger Decl., ¶ 20 and Ex. G.)  The PowerPoint presentation that Mr. Sun sent to the WSIB is dated August 2007, showing that it was developed and used to contact Shoreline's customers even while Messrs. Sun and Du were still Shoreline employees.  (Fanger Decl., ¶ 21.)  That PowerPoint presentation shows that the business model on which Asia LTI is based stems largely or entirely from Shoreline's confidential and proprietary financial model and other trade secrets.  (Id.)  It also includes a direct reference to a confidential deal that Shoreline closed that bore the code name "#1233"; the "Portfolio Pricing" process described in it is exactly the same as Shoreline's pricing process, as set forth in the Shoreline Pricing Model; it identifies Messrs. Sun and Du as having been Portfolio Managers when this was a title neither had obtained with Shoreline; and it lists a

SHORELINE CAPITAL MANAGEMENT, LTD.'S MEMO SUPPORTING *EX PARTE* APPLICATION FOR TRO AND OSC RE PRELIMINARY INJUNCTION AND EXPEDITED DISCOVERY ORDER

1  number of deals that were developed at Shoreline and the existence of which was part of

2  Shoreline's confidential information.  (Fanger Decl., ¶ 22.)

3

4      25.      During a meeting with Shuikang Sun at Huarong's offices, Shoreline asset

5  manager Deguang Zheng (along with colleague Yan Wen) learned from Shuikang Sun that

6  because he believed Xiaobing Sun to be a member of Shoreline, he had allowed Xiaobing Sun to

7  visit him at Huarong's offices and to receive information on a 29-borrower portfolio of loans, on

8  which Xiaobing Sun proceeded to do due diligence as part of an attempt to close an investment

9  transaction for investors unrelated to Shoreline and unknown to Shoreline.  (Zheng Decl., ¶ 5;

10 Yang Decl., ¶ 4(1).)

11

12     26.      Apparently, the due diligence done in Huarong offices took about one week, and

13 Mr. Sun was joined in this work by Jianping Zhou who is a former employee of Shoreline.

14 (Zheng Decl., ¶ 5.)  That due diligence was completed using Shoreline's laptop, financial models

15 and other analysis tools, which Xiaobing Sun still had at the time of the visit to Huarong.  And,

16 as a result of their work on this portfolio, Messrs. Sun and Du were paid a fee by the investor

17 whom they represented; that the investor bought the portfolio.  (Id., ¶ 6.)

18

19     27.      A significant part of the models and reports used in the due diligence are the same

20 as Shoreline's financial models used in the acquisition of portfolio "#1233", which are

21 Shoreline's proprietary and confidential trade secrets.  (Zheng Decl., ¶ 7; Yang Decl., ¶¶ 4(4)-

22 (5).)

23

24     28.      A former employee of Shoreline named Feng Lin, who went to work for Asia LTI

25 (Zhang Decl., ¶ 7), has admitted to Shoreline that Mr. Sun, Mr. Du and two others participated in

26 due diligence on non-performing loans at both Huarong and Cinda.  These activities were

27 conducted under the Chinese name for Asia LTI, Rongteng Investment Co. (Yang Decl., ¶ 4(5).)

28 Further, while working with Mr. Sun at Rongteng, Mr. Lin saw Mr. Sun keep Shoreline's

- 11 -

1  financial models, Excel spreadsheets and loan documents in his (or Shoreline's) laptop computer.

2  When Mr. Lin saw those materials in the laptop, Mr. Sun had already left Shoreline and started

3  working for Rongteng.  (Zhang Decl., ¶ 7.)

4

5       29.     Apparently, Mr. Sun even sent Shoreline's portfolio files, pricing materials and

6  financial analysis models to one of his friends working at Goldman Sachs in order to convince

7  that friend to join Rongteng.  (Zhang Decl., ¶6.)

8

9       30.     And one of the smaller owners of Asia LTI, Jianping Zhou, has expressed the

10  desire to sell Shoreline's financial models, loan files from previous portfolios, and other

11  proprietary and trade secret information.  (Yang Decl., ¶ 4(5).)

12

13       31.     In December 2007, two Shoreline limited partners notified Shoreline that Mr. Sun

14  and Mr. Du had contacted them.  Messrs. Sun and Du had become acquainted with these limited

15  partners while they were at Shoreline when these limited partners had visited Shoreline's

16  Guangzhou office.  In e-mails to one of Shoreline's limited partners, Mr. Sun claimed that he had

17  set up his own fund doing the same business as Shoreline.  (Zhang Decl., ¶5.)

18

19       32.     On December 20, 2007, both Mr. Sun and Mr. Du claimed to be co-founders of

20  Rongteng Investment Co., or Asia LTI, in a Private Placement Memorandum they sent to

21  Shoreline's limited partners.  (Zhang Decl., ¶6.)

22

23       33.     Shoreline believes that Messrs. Sun and Du have contacted numerous other

24  investors connected to Shoreline.  (Fanger Decl., ¶ 23.)

25

26       33.     Mr. Fanger met with Mr. Sun on December 5, 2007 to attempt to dissuade him

27  from continuing to disseminate Shoreline's confidential proprietary information, and to convince

28  him to adhere to the terms of his NDA and employment letter.  On that day, he informed Mr.

SHORELINE CAPITAL MANAGEMENT, LTD.'S MEMO SUPPORTING *EX PARTE* APPLICATION
FOR TRO AND OSC RE PRELIMINARY INJUNCTION AND EXPEDITED DISCOVERY ORDER

1   Fanger that he was competing in non-performing loans and distressed real estate in China, the

2   exact areas that he expressly agreed not to compete in when he signed the employment offer

3   letter on March 5, 2007.  He claimed that he should be allowed to compete since he felt he had

4   been essentially terminated by Shoreline.  But he admitted that Shoreline never told him he was

5   terminated and his e-mail to Mr. Gantt on November 29 confirms that he left of his own volition:

6   "Since I don't feel it's culture is a good fit for me working at Shoreline, I left before being

7   transformed into a formal employee, then I started a firm with a local lawyer."  (Fanger Decl., ¶

8   23 and Ex. G thereto.)

9

10         34.    During the December 5, 2007 meeting Mr. Sun did not agree to cease his actions.

11  Instead, he tried to convince Mr. Fanger to join him in his new competing venture.  (Fanger

12  Decl., ¶ 24.)

13

14         35.    In the course of trying to induce Mr. Fanger to come to work for Asia LTI, Mr.

15  Sun sent Mr. Fanger an Excel spreadsheet that purported to articulate Asia LTI's financial model.

16  It was identical to the confidential and proprietary Shoreline Pricing Model, except that in place

17  of Shoreline's name, Mr. Sun had added Asia LTI.  (Fanger Decl., ¶ 25.)

18

19         36.    Because Mr. Fanger expressed doubts about Mr. Sun's ability to analyze and price

20  assets, in the meeting on December 5, 2007, Mr. Sun showed him financial models on Mr. Sun's

21  personal laptop that he stated he had used to price several portfolios for a Chinese investor.  He

22  stated he had been paid for this service by the Chinese investor.  (Later, after reading the

23  declaration of Shoreline employee Deguang Zheng in this case, Mr. Fanger realized that the

24  portfolio he was referring to was the same Huarong portfolio that was prepared in August with

25  Shoreline's models.)  In the course of opening Excel files on his laptop, Mr. Sun admitted to Mr.

26  Fanger that he used these files to do analysis on new distressed asset portfolios.  Mr. Fanger

27  viewed the details of the Excel files for upwards of ten minutes and saw that they contained the

28

- 13 -

same pricing techniques used in Shoreline's pricing of portfolio "#1233," which Mr. Sun was involved with servicing while he was at Shoreline.  (Fanger Decl., ¶ 26.)

37.    On January 6, 2008, Mr. Fanger called Valerie Cooper at Asia Alternatives to confirm that she had been solicited by Mr. Sun.  (Fanger Decl., ¶ 27.)

38.    On January 8, 2008, Mr. Fanger met with Mr. Sun to ask him one last time whether he intended to stop his improper competition and use of Shoreline's confidential information.  Mr. Sun indicated no such intention.  (Fanger Decl., ¶ 28.)

39.    Shoreline is presently in the process of closing a fund.  As it heads for a first closing in mid January 2008 and further closings in February and March, Mr. Sun's and Asia LTI's contacts with Shoreline's investors and dissemination of Shoreline's trade secrets and confidential and proprietary information, as well as its solicitations of its investors based on Shoreline's financial model are interfering with Shoreline's ability to complete this important business.

Therefore, Shoreline seeks the following temporary injunctive relief and order:

A.    A Temporary Restraining Order enjoining and restraining Defendant Xiaobing Sun, directly or indirectly, whether acting alone or in concert with others, including any officer, agent representative, or employee of Asia LTI from:

1.    Soliciting any business from any Shoreline client, customer or vendor whom Defendant Sun served during his employment with Shoreline, or any other client, customer or vendor whose name became known to Defendant Sun while in the employ of Shoreline (for purposes of this Order, Shoreline shall include Shoreline Capital Management, Ltd., as

- 14 -

well as its wholly owned subsidiary, Shoreline Capital Consulting (Shenzhen) Co., Ltd. (Shoreline Shenzhen), and Guangzhou United, the onshore agent of Shoreline Shenzhen.

2. Contacting for business purposes, whether in person, through others, by telephone or in writing, any client, customer or vendor of Shoreline whom Defendant Sun served during his employment with Shoreline, or any other client, customer or vendor whose name became known to Defendant Sun while in the employ of Shoreline;

3. Soliciting for employment any current employee of Shoreline;

4. Using, disclosing, or transmitting for any purpose (including but not limited to the solicitation of said clients, customers, vendors and employees of Shoreline), the names, addresses, telephone numbers, and other contact information as well as any financial information of any of said clients, customers, vendors and employees of Shoreline, any information contained in Shoreline's records, including but not limited to the financial model known as The Shoreline Pricing Model or The Shoreline Debt Pricing Model, and any of Shoreline's Potential Investment Lists.

B. Ordering Defendant Xiaobing Sun to return to Shoreline as promptly as possible all originals copies, or other reproductions in whatever form of the names, addresses, telephone numbers, and other contact information as well as any financial information of any of Shoreline's clients, customers, vendors and employees, any information contained in Shoreline's records, including but not

- 15 -

1    limited to the financial model known as The Shoreline Pricing Model or The

2    Shoreline Debt Pricing Model, and any of Shoreline's Potential Investment Lists.

3

4    C.    Ordering Defendant Xiaobing Sun to return to Shoreline as promptly as possible

5          all originals copies, or other reproductions in whatever form of any Shoreline

6          document or other form of recorded information.

7

8    D.    Ordering Defendant Xiaobing Sun to return to Shoreline as promptly as possible

9          any of Shoreline's computer equipment in his possession, custody or control, as

10         well as any Shoreline computer software, hardware or data he may possess, have

11         custody of or control.

12

13   E.    Ordering Defendant Xiaobing Sun promptly to make available for inspection by

14         Shoreline or its expert all computer environments used by Defendant, including

15         but not limited to desktop, laptop, and hand-held computers, personal digital

16         assistants, cell phone address books and memos, whether they be utilized at Asia

17         LTI, Defendant's residence or elsewhere.

18

19   F.    Keeping the temporary restraining order in full force and effect pending further

20         order of thes Court, and establishing a date for hearing on Shoreline's Motion for

21         Preliminary Injunction, including Opposition and Reply filing dates.

22

23

24

25

26

27

28

SHORELINE CAPITAL MANAGEMENT, LTD.'S MEMO SUPPORTING *EX PARTE* APPLICATION
FOR TRO AND OSC RE PRELIMINARY INJUNCTION AND EXPEDITED DISCOVERY ORDER

1       G.       Granting the parties leave to commence discovery immediately in preparation for

2       the preliminary injunction hearing, and to conduct depositions of parties and

3       employees and principals of Asia LTI on five days' notice (15 days' notice if the

4       depositions are to occur outside the United States); and to require that responses

5       to requests for documents be served within five days.

8     DATED:  January 14, 2008.           COMMINS & WEBSTER
Professional Corporation

By:  /David H.S. Commins/
David H.S. Commins
Attorneys for Plaintiff
Shoreline Capital Management, Ltd.

- 17 -

SHORELINE CAPITAL MANAGEMENT, LTD.'S MEMO SUPPORTING *EX PARTE* APPLICATION
FOR TRO AND OSC RE PRELIMINARY INJUNCTION AND EXPEDITED DISCOVERY ORDER