1   CHARLES H. JUNG (SBN 217909)
    MICHAEL P. DILLINGHAM (SBN 244086)
2   NASSIRI & JUNG LLP
    251 Kearny Street, Suite 501
3   San Francisco, CA 94108
    Telephone:  (415) 373-5699
4   Facsimile:  (415) 534-3200
    cjung@nassiri-jung.com
5
    Attorneys for Defendant
6   XIAOBING SUN

7

8

9                   UNITED STATES DISTRICT COURT

10                 NORTHERN DISTRICT OF CALIFORNIA

11                      SAN JOSE DIVISION

12

13  SHORELINE CAPTIAL MANAGEMENT,        Case No. 5:08-cv-00121-JW
    LTD., a British Virgin Islands Company
14  limited by shares,                   DEFENDANT'S OPPOSITION TO
                                         PLAINTIFF'S MOTION FOR
15                  Plaintiff,           PRELIMINARY INJUNCTION

16          vs.

17  XIAOBING SUN, an individual,

18                  Defendant.

19

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## TABLE OF CONTENTS

### INTRODUCTION

### FACTS

INTRODUCTION ..... 1

FACTS ..... 3

**A.    SHORELINE PLAYS GAMES WITH NOTICE AND SETTLEMENT** ..... 3

**B.    SHORELINE FRAUDULENTLY INDUCES SUN TO UPROOT HIS LIFE, QUIT SCHOOL, AND MOVE TO CHINA** ..... 4

**C.    SHORELINE MISREPRESENTS ITSELF TO SUN** ..... 4

**D.    THERE IS NO "SHORELINE PRICING MODEL", AND THE EXCEL SPREADSHEET SHORELINE CLAIMS AS ITS OWN WAS NEITHER DEVELOPED BY SHORELINE NOR KEPT CONFIDENTIAL** ..... 5

**E.    SHORELINE BREACHES ITS ILLEGAL CONTRACT AND TERMINATES SUN** ..... 6

**F.    SHORELINE WAITS FOR HALF A YEAR BEFORE SUDDENLY CLAIMING THEFT OF ITS SPREADSHEET** ..... 7

**G.    SHORELINE SUBMITS FALSE DECLARATIONS AND INTIMIDATES WITNESSES** ..... 7

LEGAL ANALYSIS ..... 8

**A.    THIS CASE MUST BE DISMISSED BECAUSE MR. SUN IS NOT SUBJECT TO DIVERSITY JURISDICTION UNDER 28 U.S.C. § 1332(A)** ..... 8

**B.    STANDARD FOR PRELIMINARY INJUNCTION** ..... 11

**C.    SHORELINE CANNOT SUCCEED ON THE MERITS** ..... 11

**1.    Under California Law, Shoreline May Not Use Its Improper Non-Compete Clause to Stifle Competition or Trap Mr. Sun** ..... 11

**a.    The Offer Letter Is Subject to Both California Law and Strong Public Policy Against Enforcement of Non-Compete** ..... 11

### LEGAL ANALYSIS

Provisions.

    b.    **Shoreline Fails to Allege Facts Sufficient**    12
**to    Overcome    Public    Policy    Against**
**Enforcement of Non-Compete Provisions**

    c.    **Shoreline's    Employment    Agreement**    15
**Terms, Including the Non-Compete Provisions,**
**Are Unfair and Anti-Competitive**

**2.    Shoreline    Never    Kept    Its    Spreadsheet**    17
**Confidential and the Prospective Deal List Is Publicly**
**Available to the Industry**

    a.    **Employment Agreement Is Void and**    17
**Makes No Mention of Spreadsheet or Potential**
**Deal List**

    b.    **Mr. Sun Never Received an Employee**    18
**Handbook**

    c.    **Shoreline's Measures Were**    18
**Unreasonable**

    d.    **Shoreline's Spreadsheet and Prospective**    18
**Deal List Were Generally Known to the**
**Industry**

    e.    **All of the Deals in Mr. Sun's PowerPoint**    19
**Were Discovered Through His Independent**
**Research**

**3.    Shoreline Cannot Prevail on Its Breach of**    20
**Contract Claim**

**4.    Shoreline Will Fail on Its Misappropriation of**    20
**Trade Secrets Claim**

**5.    Shoreline    Fails    to    Support    Any    of    the**    21
**Remaining    Causes    of    Action    for    Which    It    Seeks**
**Preliminary Injunction**

D.    BALANCE OF HARDSHIPS DO NOT TIP                     23
SHARPLY IN SHORELINE'S FAVOR

E.    SHORELINE'S "HARM" CANNOT BE                         24
IRREPARABLE BECAUSE  SHORELINE WAITED
MONTHS BEFORE BRINGING THIS ACTION

F.    DISCOVERY SHOULD NOT BE ACCELERATED                  25

**CONCLUSION**                                             26

1

## TABLE OF AUTHORITIES

2

3

STATUTES

4

5

28 U.S.C. § 1332    .........................................................................................................9, 10

6

Cal. Bus. & Prof. Code § 16600    .................................................11, 12, 13, 15, 16, 17

7

Cal. Civil Code § 1646    .........................................................................................12

8

9

CASES

10

11

Mazurek v. Armstrong, 520 U.S. 968 (1997)   .................................................................11

12

Mississippi Band of Choctaw Indians v. Holyfield, 490 U.S. 30 (1989) ..  ...................................10

13

14

McNutt v. General Motors Acceptance Corp., 298 U.S. 178 (1936)   ...........................................10

15

Newman-Green, Inc. v. Alfonzo-Larrain, 490 U.S. 826 (1989)   ...............................................9, 10

16

17

Ruckelshaus v. Monsanto Co., 467 U.S. 986 (U.S. 1984)   ..........................................................17

18

Sampson v. Murray,  415 U.S. 61 (1974)    .................................................................................25

19

20

Brady v. Brown, 51 F.3d 810 (9th Cir. 1995)    ......................................................................9-10

21

Immigrant Assistance Project of the L.A. County Fed'n of Labor v. INS,
306 F.3d 842 (9th Cir. 2002)    .....................................................................................11

22

23

In re Ford Motor Co./Citibank (South Dakota), N.A., 264 F.3d 952 (9th Cir. 2001)  ..........  .......10

24

25

Oakland Tribune, Inc. v. Chronicle Pub. Co., 762 F.2d 1374 (9th Cir. 1985)  .......................24-25

26

Rivera v. Railroad Retirement Bd., 262 F.3d 1005 (9th Cir. 2001)  ...............................................9

27

28

Zepeda v. U.S. I.N.S., 753 F.2d 719 (9th Cir. 1983)    .................................................................9

OPPOSITION TO MOTION FOR
PRELIMINARY INJUNCTION

1

Givemepower Corp. v. Pace Compumetrics, Inc., 2007 WL 951350 (S.D. Cal. 2007)                25

Latona v. Aetna U.S. Healthcare Inc., 82 F.Supp.2d 1089 (C.D. Cal. 1999)  ............................17

Scott v. Snelling and Snelling, Inc., 732 F. Supp. 1034 (N.D. Cal. 1990)  ...................................19

Aetna Bldg. Maintenance Co. v. West, 39 Cal. 2d 198 (1952)  ....................................................19

Continental Car–Na–Var Corp. v. Moseley, 24 Cal. 2d 104 (1944)  ..........................................14

Application Group, Inc. v. Hunter Group, Inc., 61 Cal. App. 4th 881 (1998)        ......................12

Fibreboard Paper Products Corp. v. East Bay Union of Machinists, Local 1304, United
Steelworkers of America, AFL-CIO, 227 Cal. App. 2d 675 (1964)  ........................................1, 23

Kolani v. Gluska, 64 Cal. App. 4th 402 (Cal. Ct. App. 1998)    ...................................................13

Metro Traffic Control, Inc. v. Shadow Traffic Network, 22 Cal. App. 4th 853 (Cal. Ct. App.
1994)    .........................................................................................................................................15

1         This preliminary injunction motion calls to mind the maxim that 'he who comes into

2    equity must come with clean hands.'[1]  Shoreline Capital Management, Ltd. ("Shoreline") shades

3    the truth to its recruits, its employees, and to this Court.  To prevail on its present motion,

4    Shoreline has engaged in dissembling and witness intimidation, demonstrating that Shoreline will

5    say anything it takes to win.  Shoreline's behavior should not be rewarded with an injunction.

6         Defendant Xiaobing Sun ("Sun") is a citizen of the United States but is domiciled in

7    China.  Mr. Sun permanently resides in China, and has no present intent to return to the United

8    States to live.  Shoreline successfully induced Mr. Sun to uproot his life and move to China with

9    the promise of permanent employment.  And Mr. Sun did move to China, quitting his degree

10   program at the University of Chicago.  He was served while he returned to the United States to

11   retrieve one of his children to China.  Because plaintiff brings this case under diversity

12   jurisdiction where defendant is not domiciled in any state, under the controlling Ninth Circuit

13   law, this case must be dismissed for lack of subject matter jurisdiction.

14        Even if the Court proceeds to consider the preliminary injunction motion, which it should

15   not, no injunction should issue because there is no "Shoreline Pricing Model".  Shoreline so-

16   called pricing model is actually an Excel Spreadsheet developed by another company.  And

17   Shoreline never kept the spreadsheet confidential.

18        Shoreline disclosed the spreadsheet to Mr. Sun on January 11, 2007.  It did so before

19   asking for *any* confidentiality treatment of the document because the document is neither

20   confidential nor proprietary.  Furthermore, the confidentiality agreement that was purportedly

21   signed on January 26, 2007 *specifically excludes* the spreadsheet.  This is because even under the

22   purported confidentiality agreement, "Proprietary Information *shall not include* any information .

23   . . already in the Interested Party's possession . . . ."  (Declaration of Benjamin Fanger[2] "B.

24   Fanger Decl.", Exh. A) (emphasis supplied.)

25   

---

26   [1] This foundational principal of equity is reflected in cases such as <u>Fibreboard Paper Products Corp.</u> v. <u>East Bay Union of Machinists, Local 1304, United Steelworkers of America, AFL-CIO</u>, 227 Cal. App. 2d 675, 727 (1964).

27   There the court held that "It cannot be questioned that the defense of unclean hands may be urged against a party seeking the aid of equity by way of an *injunction*." <u>Id.</u> (emphasis supplied).

28   [2] Docket No. 6.

OPPOSITION TO MOTION FOR
PRELIMINARY INJUNCTION

1   Furthermore, Shoreline's purported employment agreement is void as against public

2   policy.   The agreement restricts Mr. Sun from "compet[ing] or work[ing] directly in the non-

3   performing loan or distressed real estate investment markets in China for a period of two years . .

4   . ." (B. Fanger Decl.; Exh. B.)  This covenant not to compete is flatly against public policy, and

5   renders the entire agreement void.

6   There are no irreparable injuries at stake here since Shoreline has now waited *half a year*

7   before bringing this complaint and the present motion for injunctive relief.   Furthermore,

8   Shoreline can apparently estimate (and has done so) the value of its Spreadsheet, so damages are

9   an adequate remedy.

10  Even though it had months to prepare its complaint and application, Shoreline supports it

11  motion only with inadmissible and self-serving declarations by Shoreline's employees.

12  Disturbingly, calls by Mr. Sun's attorney to the third-party witnesses cited in those declarations

13  show that Shoreline's declarations are false, and that Shoreline has threatened and intimidated

14  witnesses.

15  This case should be dismissed because the Court lacks subject matter jurisdiction.   But

16  even if the Court proceeds to the merits, Shoreline has no protectible trade secrets.   Shoreline has

17  engaged in a pattern of inequitable and unlawful behavior that should not be rewarded by a

18  preliminary injunction.

19

20

21

22

23

24

25

26

27

28

CASE NO. 5:08-CV-00121-JW

OPPOSITION TO MOTION FOR
PRELIMINARY INJUNCTION

**FACTS**

**A.    SHORELINE PLAYS GAMES WITH NOTICE AND SETTLEMENT**

In the few short days since January 8 when this case apparently filed, Shoreline has repeatedly played games with notice.  Seeking to deprive Mr. Sun of a fair opportunity to oppose Shoreline's requested injunction, Shoreline deceived Mr. Sun and misled this Court.  In a letter dated January 8, 2008, Shoreline's attorney stated that "Later this week, we intend to file an *Ex Parte* Application for a Temporary Restraining Order . . . ."  (Docket #5: Commins Decl., Exh. A.)  Shoreline promised to "attempt to contact" Mr. Sun "in advance" as "soon as" the *Ex Parte* Application papers "have been completed . . . ."  (Id.)  But the docket shows that Shoreline never gave Mr. Sun notice of the date or time of its *Ex Parte* Application.  In fact, Shoreline failed to give notice of the application at all until the next day, when the Court issued  its ruling.

Immediately after Mr. Sun was able to retain counsel, Mr. Sun's counsel called Shoreline's counsel.  Mr. Sun's counsel proposed that given that "Shoreline is highly unlikely to obtain any negative injunction against Mr. Sun prohibiting him from competing with Shoreline", the parties forge an "amicable resolution to this matter before Mr. Sun is forced to expend resources in opposing Shoreline's preliminary injunction motion."  (Declaration of Charles H. Jung "C. Jung Decl." ¶ 2, Exh. A.)  Seeking to string along Mr. Sun, Shoreline stated that "in good faith that Shoreline is interested in resolving this case on an amicable basis, . . ."  (Id.)  But Shoreline delayed confirming whether the parties would reach a settlement for four days, until the *day before* the opposition was due.  (Id. ¶ 3.)

Shoreline's strategy is transparent.  Shoreline delayed notice to Mr. Sun of its *Ex Parte* Application until it was too late for Mr. Sun to lodge an opposition.  And then it sought to string along Mr. Sun, hoping to dwindle to an impossibly brief time the period in which he had to prepare his opposition to Shoreline's requested preliminary injunction.  Shoreline's actions are unfair, and Mr. Sun believes that it grossly unjust to be placed at risk of a preliminary injunction where a party has had almost no time to prepare its opposition.  Out of an abundance of caution, however, and since Mr. Sun believes that the jurisdictional issues raised herein are dispositive, Mr. Sun submits the following facts and analysis.

OPPOSITION TO MOTION FOR
PRELIMINARY INJUNCTION

**B.   SHORELINE FRAUDULENTLY INDUCES SUN TO UPROOT HIS LIFE, QUIT SCHOOL, AND MOVE TO CHINA**

Beginning in November 2006, seeking to induce Mr. Sun to uproot his life, Mr. Fanger recruited Mr. Sun from the Graduate School of Business at the University of Chicago. (Declaration of Xiaobing Sun "X. Sun Decl." ¶ 2.)  Promising partnership and a permanent position, Fanger guaranteed a prominent place in the company to Mr. Sun.  Shoreline lacked an original asset pricing model in distressed debt.  (Id. ¶ 2.)  And *before* signing any confidentiality or any other agreement, Fanger *disclosed* to Mr. Sun what Shoreline now claims is its "Shoreline Pricing Model."  (Id. ¶ 2; Exh. A.)

After making oral representations regarding the guarantee of long term employment, Shoreline and Fanger convinced Mr. Sun to abandon his degree program, and uproot his life to move back to China.  (Id. ¶ 3.)  Shoreline and Fanger rushed Mr. Sun into signing an "offer letter."  (Id.)  Despite stating in the letter that Mr. Sun would first experience a "trial period" at Shoreline, Mr. Fanger assured Mr. Sun that his employment was guaranteed.  (Id.)  Promising much greater pay in the future, Shoreline offered an initial salary of only about $1,200 a month (the approximate U.S. value at the time of 10,000 RMB/CNY).  (Id.)  Mr. Sun quit the University of Chicago and moved to China with the expectation of permanent employment.  (Id.)

**C.   SHORELINE MISREPRESENTS ITSELF TO SUN**

Shoreline is not what it represented itself to be to Mr. Sun or to this Court.  While it claims to be a "private investment firm that manages assets for institutional investors", it fails to disclose to this Court that during the entire period of Mr. Sun's employment with Shoreline, from March 26, 2007 until his termination on July 17, 2007, Shoreline was a consulting company, and *not* a "investment firm".  (Id. ¶ 4.)  Shoreline lacked a single fund investor since it had no fund to offer until the end of 2007, *after* Mr. Sun was terminated.  (C. Jung Decl. ¶ 4; Exh. B.)  As stated in the Private Equity Journal, as of September 2006, Shoreline only planned to "begin raising money [for a fund] in 2007 . . . ."  (Id.)  (This entire shift in emphasis is apparently why Shoreline goes to such great lengths to muddy the date on which Mr. Sun was terminated, July 17, 2007.)

Rather than operating a fund, Shoreline was a subcontractor that conducted due diligence

OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

1   for a single "client" CarVal Investors ("CarVal"). (X. Sun Decl. ¶ 5.) Even though it claims to

2   close "deals" Shoreline's transactions are extremely rare events. Since its inception in 2004,

3   Shoreline has helped its sole client source no more than 4 deals. (C. Jung Decl. ¶ 5; Exh. C.)

4   This represents less than 0.1% of the market. (X. Sun Decl. ¶ 5.) While Shoreline claims

5   "Huarang" as its client, this is untrue. Huarang is a public entity, and it is not a Shoreline

6   "client." (Id.) In short, Shoreline had no investor clients and never purchased any distressed

7   debt before Mr. Sun left Shoreline. (Id.)

8       Shoreline deceptively paints a picture to this Court that it occupies a solitary position,

9   sourcing deals from unique information. In fact, there are countless players in the Chinese

10  distressed debt market, including innumerable financial firms and law firms that occupy exactly

11  the same industry. (Id. ¶ 6.) These firms, like Shoreline source their deals from ***publicly-***

12  ***available*** Chinese websites, including http://www.chamc.com.cn/, http://www.cinda.com.cn/,

13  http://www.coamc.com.cn/, and http://www.gwamcc.com/. (Id.)

14      Not limiting its obfuscation to its sworn legal filings, Shoreline also deceives its industry

15  contacts in China, and its own employees. In its business dealings in China (including on its

16  business cards), Shoreline does not disclose that it claims to be a British Virgin Islands-based

17  company. (Id. ¶ 7.) Instead, it lists itself deceptively as a United States company to gain

18  creditability. (Id.) Shoreline also hides from the public and its recruits that it is in essence a

19  family company. Strangely, Shoreline hides the fact that two of its principals (and declarants),

20  Xiaolin Zhang and Linyu Yang, are married and co-habitating. (Id.) Equally odd, other key

21  Shoreline employees hide the fact that they are relatives of Shoreline's principals. (Id.)

22  Shoreline's finance and accounting manager is Mr. Yang's sister, and she hides her true last

23  name. (Id.) (In fact, five of Shoreline's total ten permanent employees in its Guangzhou office

24  are Mr. Yang's relatives.) (Id. )

25  **D.   THERE IS NO "SHORELINE PRICING MODEL", AND THE EXCEL
    SPREADSHEET SHORELINE CLAIMS AS ITS OWN WAS NEITHER DEVELOPED
26  BY SHORELINE NOR KEPT CONFIDENTIAL**

27      There is no "Shoreline pricing model." (Id. ¶ 8.) Instead, Shoreline uses a spreadsheet

28

OPPOSITION TO MOTION FOR
PRELIMINARY INJUNCTION

1  that was developed by other companies.  (Id.)  And even this spreadsheet is not confidential.  (Id.)

2  Shoreline disclosed it to Mr. Sun before even requesting any confidentiality agreement from him

3  and before he was employed by Shoreline.  (Id.)

4      The Excel spreadsheet that Shoreline presumably refers to as its Shoreline pricing model

5  was originally developed by Goldman Sachs and other institutions.  (Id. ¶ 9.)  This model was

6  refined or redeveloped by CarVal, and then it was shared with Shoreline.  (Id.)  Thus, far from

7  taking "three and one-half years to develop" and "hundreds of thousands of dollars", Shoreline

8  received a ready-made pricing model from the entity for which it conducted due diligence.

9      The so-called Shoreline pricing model ("Spreadsheet") is driven by a plain vanilla

10 discounted cash flow (DCF) approach, which is found in any first-year finance textbook.  (Id. ¶

11 10.)  Each of the portions of the Spreadsheet including the "legal risk" portion is industry

12 standard common sense for the distressed debt industry.  (Id.)

13     Shoreline revealed the Spreadsheet to Mr. Sun on January 11, 2007.  (Id. ¶ 11.)  The

14 Spreadsheet was revealed before any confidentiality agreement was signed.  (Id.)  Shoreline failed

15 to refer to the Spreadsheet as anything other than a "sheet", and certainly never referred to it as a

16 confidential Shoreline Pricing Model.  (Id.)  Furthermore, the confidentiality agreement, which

17 was purportedly signed on January 26, 2007 **specifically excludes** the spreadsheet.  (Mr. Sun

18 never received a copy of Shoreline's purported employee handbook.  (Id.).)  Under that

19 agreement, "Proprietary Information **shall not include** any information . . . already in the

20 Interested Party's possession . . . ."  (B. Fanger Decl.; Exh. A) (emphasis supplied.)

21 **E.    SHORELINE BREACHES ITS ILLEGAL CONTRACT AND TERMINATES SUN**

22     Shoreline breached its purported agreement with Mr. Sun (which as discussed below is

23 void as against public policy).  In early July 2007, Shoreline's principles gave Mr. Sun a test, and

24 told him that his employment would be terminated if he could not pass it.  (X. Sun Decl. ¶ 12.)

25 Mr. Sun finished the test and sent to the Shoreline three principles within the same week.  (Id.)

26 One week later, Shoreline informed him that he failed the test.  (Id.)  At that time, Shoreline had

27 already stopped paying Mr. Sun, and owed him for his entire June salary.  (Id.)  And Shoreline

28 never paid Mr. Sun for any work after it terminated him on July 17.  (Id.)

OPPOSITION TO MOTION FOR
PRELIMINARY INJUNCTION

**F.    SHORELINE WAITS FOR HALF A YEAR BEFORE SUDDENLY CLAIMING THEFT OF ITS SPREADSHEET**

Shoreline claims that it was not aware until December that Mr. Sun was competing against it. This is belied by common sense and Shoreline's own declarations. Shoreline stopped paying Mr. Sun in June and Mr. Sun ceased appearing at the office in July. Mr. Yang, a Shoreline principle, writes in his declaration that on August 15, 2007, he learned from his employee that Mr. Sun was "already contacting and soliciting business from [Shoreline's] customers falsely using his Shoreline title." (L. Yang Decl. ¶ 4.1, Docket No. 12.) Thus, at the latest, Shoreline waiting for a period of at least five months after it knew of Mr. Sun's alleged unlawful competition and the filing of its TRO application.

**G.    SHORELINE SUBMITS FALSE DECLARATIONS AND INTIMIDATES WITNESSES**

Counsel from Mr. Sun has investigated the statements attributed to third parties in Shoreline's declarations. (C. Jung Decl. ¶ 6.) They are false. (<u>Id.</u>) And it appears that Shoreline is engaging in witness intimidation. Xiaolin Zhang ("Zhang"), a principal of Shoreline, testifies that she called Qiang Du. She claims that Du told her that Du "had seen Xiaobing Sun send Shoreline's portfolio files, pricing materials and financial analysis models to Xiaobing's friend working at Goldman Sachs . . . ." (Zhang Decl. ¶ 6.) But Mr. Du denied this entirely to Mr. Sun's counsel, saying that "I never told Ms. Zhang that Xiaobing Sun sent Shoreline's portfolio files, pricing materials or any financial analysis models to Mr. Sun's friend working at Goldman Sachs." (C. Jung Decl. ¶ 6-7, Exh. D, ¶ 2.) Mr. Du stated that Ms. Zhang threatened to "ruin my reputation and ruin my career if did not cooperate with her and Shoreline in their litigation against Mr. Sun." (<u>Id.</u>) Ms. Zhang also "threatened to send an email message to GSB alumni that would ruin my reputation." Ms. Zhang "threatened to send an email message to all potential investors and funds to stop me from working in finance or the non-performing loan industry" if Mr. Du did not cooperate. And further "threatened to sue" Mr. Du and make it impossible to "leave China." (<u>Id.</u>) When Mr. Sun's counsel asked Mr. Du to sign a declaration stating these facts, he initially agreed. (C. Jung Decl. ¶ 7, Exh. D.) But then he

OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

changed his mind.  (Id. ¶ 8; Exh. E.)  Mr. Du agreed that the declaration is accurate, and that Zhang's statements attributed to him are untrue.  (Id.)  But Mr. Du was "concerned that Shoreline is 'after [him]' and that [he] would suffer bad consequences from Shoreline should [he] sign this declaration.  (Id.)

Likewise, Feng Lin states that the statements attributed to him in the Zhang and Yang declarations are false.  (X. Sun Decl. ¶ 13; Exh. B.)  Mr. Lin states that he "never saw Mr. Sun keep Shoreline's financial models, so-called #1233 portfolio loan documents (or any other loan documents), Excel spreadsheets, pricing templates, file-reading reports, copies of title papers related to the #1233 portfolio, Shoreline's so-called "business secrets", or due diligence results of portfolios under Shoreline's management in his laptop computer or anywhere else." (Id.)  He also denies that "Mr. Sun [ever] used Shoreline's name to gain a meeting with anyone at Huarong Asset Management Company."  (Id.)  And he "never stated that [he] believe[s] that Mr. Sun breached any non-compete or confidentiality agreements with Shoreline."  (Id.)  But Mr. Lin also refuses to sign a declaration stating these facts because Shoreline's principals have threatened him with "false rumors" and legal liability.  (Id.)  Specifically, Xialolin Zhang and Linyu Yang "threatened that if [Mr. Lin] did not cooperate with them in Shoreline's litigation against Mr. Sun, that I would be in legal trouble.  (Id.)  They threatened to spread rumors, and falsely tell my employer that I breached a contract with Shoreline and stole Shoreline's trade secrets, unless I cooperated with them.  (Id.)  Messrs. Zhang and Yang also threatened to sue me if I did not cooperate with Shoreline in pursuing its litigation."  (Id. ¶ .)

## LEGAL ANALYSIS

### A.    THIS CASE MUST BE DISMISSED BECAUSE MR. SUN IS NOT SUBJECT TO DIVERSITY JURISDICTION UNDER 28 U.S.C. § 1332(A)

This Court lacks subject matter jurisdiction over this case, and it must be dismissed.  As the Supreme Court and the Ninth Circuit have held, all lower courts must first "resolve jurisdictional issues before reaching the merits of a case."  Rivera v. Railroad Retirement Bd., 262 F.3d 1005, 1008 (9th Cir. 2001).  A "federal court may issue an injunction" only if it has "subject matter jurisdiction over the claim . . . ." Zepeda v. U.S. I.N.S., 753 F.2d 719, 727 (9th Cir. 1983).

OPPOSITION TO MOTION FOR
PRELIMINARY INJUNCTION

1    Shoreline brings this case under diversity jurisdiction. (Compl. ¶ 1.) But no jurisdiction

2    exists under 28 U.S.C. 1332(a), since no diversity exists between the parties to this action. Mr.

3    Sun is a United States citizen, but he is not a citizen of California, nor is he citizen of any other

4    state in the United States. "To be a citizen of [California] within the meaning of the diversity

5    statute, [Mr. Sun] must both be a citizen of the United States *and* be domiciled within

6    [California]." <u>Newman-Green, Inc.</u> v. <u>Alfonzo-Larrain</u>, 490 U.S. 826, 828 (1989) (emphasis in

7    original).

8    Mr. Sun is naturalized citizen of the United States. (X. Sun Decl. ¶ 14.) But he took what

9    he believed to be a permanent position with Shoreline in March 2007, and has been living and

10   working in China since then. (<u>Id.</u>) Furthermore, Mr. Sun's mother was diagnosed with cancer on

11   April 5, 2007. (<u>Id.</u>) Mr. Sun is his mother's only son, and he must stay in China indefinitely to

12   care for her. (<u>Id.</u>) Mr. Sun was purportedly served when he was visiting his children in the

13   United States, and to retrieve his son to take him back to China to live. (<u>Id.</u>) Prior to the filing of

14   the present lawsuit, Mr. Sun established his new permanent address in China. (<u>Id.</u>) He no longer

15   has a permanent address in the United States. (<u>Id.</u>) Mr. Sun's wife and his other child will join

16   him soon in China. (<u>Id.</u>) Mr. Sun is in China now, and booked his return ticket to China before

17   this lawsuit was initiated. (Id.; Exh. C.) He plans to remain in China indefinitely, and has no

18   return ticket to the United States. (X. Sun Decl. ¶ 14.)

19   Controlling Ninth Circuit authority holds no diversity jurisdiction exists under 28 U.S.C. §

20   1332(a)(2) where a United States Citizen is domiciled abroad. <u>Brady</u> v. <u>Brown</u>, 51 F.3d 810,

21   815 (9th Cir. 1995). A U.S. citizen domiciled abroad is not an "alien for the purposes of 28

22   U.S.C. § 1332(a)(2), which confers jurisdiction when a United States citizen sues aliens only."

23   <u>Id.</u> As the Supreme Court has held, "United States citizenship destroy[s] complete diversity

24   under § 1332(a)(2)." <u>Newman-Green, Inc.</u>, 490 U.S. at 829. "For adults, domicile is established

25   by physical presence in a place in connection with a certain state of mind concerning one's intent

26   to remain there." <u>Mississippi Band of Choctaw Indians</u> v. <u>Holyfield</u>, 490 U.S. 30, 48, (1989). In

27   2007, Mr. Sun most of the year in China. Because he was employed in China since the outset of

28   his employment with Shoreline, his permanent address is in China, he intends to remain in China

- 9 -

OPPOSITION TO MOTION FOR
                                                              PRELIMINARY INJUNCTION

1   indefinitely to work and to care for his mother, and because he does not intend to establish a new

2   residence in California, he is domiciled in China.  Mr. Sun "is therefore 'stateless' for purposes of

3   [28 U.S.C.] § 1332(a)(3)."  Newman-Green, Inc., 490 U.S. at 828.  Thus, there is no diversity

4   between the parties under § 1332(a)(3), and thus no subject matter jurisdiction.

5       Likewise no jurisdiction exists under Section 1332(a)(2).  Controlling Ninth Circuit

6   authority holds that where a U.S. citizen is domiciled abroad, he is "thus neither a 'citizen of a

7   state' nor an alien under 28 U.S.C. § 1332(a)(3), which confers jurisdiction when a citizen of one

8   state sues both aliens and citizens of other states."  Brady, 51 F.3d at 812-15 (9th Cir. 1995).  And

9   as the Supreme Court has held, a "stateless status" "destroy[s] complete diversity under   §

10  1332(a)(3), . . . ."  Newman-Green, Inc., 490 U.S. at 829.  Mr. Sun remains a Untied States citizen.

11  As stated above, Mr. Sun was naturalized as a United States citizen last year, prior to the date this

12  action was filed.  Thus, Mr. Sun's "'stateless' status destroy[s] . . . diversity under § 1332(a)(3),

13  and his United States citizenship destroy[s] . . . diversity under § 1332(a)(2)."  Id.

14      Finally, the "party asserting federal jurisdiction bears the burden of proving the case is

15  properly in federal court."   McNutt v. General Motors Acceptance Corp., 298 U.S. 178, 189

16  (1936)"; see also In re Ford Motor Co./Citibank (South Dakota), N.A., 264 F.3d 952, 957 (9th

17  Cir. 2001).  Shoreline has failed to meet that burden.  Shoreline's jurisdictional assertions in its

18  Complaint are simply incorrect and lack any basis.  (Compl. ¶ 2.)  Furthermore, notably absent

19  from Shoreline's jurisdictional arguments is any statement that Mr. Sun resides in the United

20  States or in California, or that Mr. Sun intends to remain in the United States or in California.

21  Indeed, Shoreline points out that "shortly after Mr. Sun executed the employment agreement

22  letter, he began working for Shoreline mostly in Guangzhou, China." (Compl. ¶ 10.)  (And,

23  perhaps as a hedge against this foreseeable jurisdictional argument, Shoreline's complaint failed

24  adequately to describe Shoreline's own citizenship.  Shoreline appears to allege that that either it,

25  or possibly one of its wholly owned subsidiaries, is a citizen of the British Virgin Isles, of

26  Guangzhou, China, of the United States generally, and possibly of California. (Compl. ¶ 2.)).

27  Thus, Shoreline has not met its burden of establishing jurisdiction.

28      The only competent evidence before this Court shows that no diversity jurisdiction exists.

OPPOSITION TO MOTION FOR
PRELIMINARY INJUNCTION

1    Thus, Mr. Sun respectfully requests that this Court dismiss the instant action against him for lack

2    of subject matter jurisdiction.

3    **B.    STANDARD FOR PRELIMINARY INJUNCTION**

4         While the Court lacks jurisdiction to reach the merits of the present preliminary injunction

5    motion (and indeed it would be unfair to do so given the games that Shoreline has played with

6    timing to oppose this motion), Mr. Sun submits the following out of an abundance of caution.

7         To obtain a preliminary injunction, Shoreline must show "either a likelihood of success on

8    the merits and the possibility of irreparable injury, or that serious questions going to the merits

9    were raised and the balance of hardships tips sharply in its favor." Immigrant Assistance Project

10   of the L.A. County Fed'n of Labor v. INS, 306 F.3d 842, 873 (9th Cir. 2002).  A preliminary

11   injunction is an "extraordinary and drastic remedy that should not be granted unless the movant,

12   by a ***clear showing***, carries the burden of persuasion." Mazurek v. Armstrong, 520 U.S. 968,

13   972, 117 S. Ct. 1865, 138 L. Ed.2d 162 (1997) (emphasis supplied).

14   **C.    SHORELINE CANNOT SUCCEED ON THE MERITS**

15        **1.    Under California Law, Shoreline May Not Use Its Improper Non-Compete
          Clause to Stifle Competition or Trap Mr. Sun**

16

17        Shoreline seek to enlist the aid of this Court in securing a right for which Shoreline could

18   not legally contract:  namely, to prohibit Mr. Sun from engaging in lawful competition.  If this

19   Court grants this injunction, Shoreline will enjoy precisely that unfair advantage that is outlawed

20   by Cal. Bus. & Prof. Code § 16600 and the weight of precedent in this State.

21        **a.    The Offer Letter Is Subject to Both California Law and Strong Public
          Policy Against Enforcement of Non-Compete Provisions**

22        The March 1, 2007 offer letter ("Offer Letter") is subject to California law, and its non-

23   competition provisions are therefore unenforceable.  Under California Civil Code § 1646, a

24   "contract is to be interpreted according to the law and usage of the place where it is to be

25   performed; or, if it does not indicate a place of performance, according to the law and usage of

26   the place where it is made."  Shoreline alleges that that the Offer Letter was negotiated and

27   executed in California. (Compl. ¶¶ 7, 9.)  Shoreline never refers to any other U.S. location for

28

1    performance, and assumes throughout its Complaint and Memoranda that California law

2    controls.[3]  Under California law, and with certain exceptions, "every contract by which anyone is

3    restrained from engaging in a lawful profession, trade, or business of any kind is to that extent

4    void." Cal. Bus. & Prof. C. § 16600.

5         Shoreline is a California employer and is also subject to California law.  Plaintiff alleges

6    that the principal who hired Mr. Sun is based in Campbell, California, (Compl. ¶ 7)  that the Offer

7    Letter was negotiated and executed in California, (Compl. ¶ 7, 9) and that Mr. Sun was hired in

8    Campbell, California (Compl. ¶ 9).  Shoreline alleges and that some of its largest clients are in

9    California.  (Compl. ¶ 1).   And Shoreline has an office in Campbell, California.  (X. Sun. Decl. ¶

10   15.)   Because it is a California employer, Shoreline is subject to California's prohibition of

11   covenants not to compete even if this Court finds that Mr. Sun is subject to its jurisdiction but not

12   a California citizen.  Application Group, Inc. v. Hunter Group, Inc., 61 Cal. App. 4th 881, 902

13   (1998) (covenant not to compete signed by Maryland employee held unenforceable under Bus. &

14   Prof. C. § 16600 as to California employer who recruited Maryland employee).

15        Because the Offer Letter was negotiated, entered into and to be performed (at least in part)

16   in California, the Offer Letter is subject to California's prohibition against non-compete

17   covenants.  And because Shoreline is a California Employer, California's strong public policy

18   applies to Shoreline and prevents Shoreline from enforcing the Offer Letter's non-compete

19   provisions against Mr. Sun regardless of his citizenship.

20        **b.    Shoreline Fails to Allege Facts Sufficient to Overcome Public Policy
                  Against Enforcement of Non-Compete Provisions**

21

22        The exceptions to § 16600 and California's public policy, noted by Shoreline in its

23   Memorandum,[4] do not operate in this case to override Mr. Sun's right to compete with Shoreline.

24   Shoreline argues that because its pricing model is a trade secret, and because Mr. Sun would not

25   be able to compete without using that pricing model, that Shoreline is entitled to prohibit Mr. Sun

26   ───────────────
     [3]      Shoreline's complaint relies upon California State law for its causes of action.  See Complaint at 1-3.  And

27   Shoreline's Memorandum supporting its Ex-Parte Application, Docket No. 4, relies on California state statutes and
     case law throughout.

28   [4] Memorandum at 19-21.

OPPOSITION TO MOTION FOR
PRELIMINARY INJUNCTION

1    from competing with Shoreline in any way.  This logic is flawed.  *If* this Court finds (1) that

2    Shoreline's Spreadsheet is a trade secret, **and** (2) that Mr. Sun misappropriated it, **and** (3) that

3    Mr. Sun now uses it to the detriment of Shoreline, then Shoreline might be entitled to an

4    injunction against such use of the Spreadsheet.  But Shoreline is not, under any of the alleged

5    circumstances, entitled to a general injunction against competition by Mr. Sun.

6        Neither is Shoreline entitled to have the Court reform the Offer Letter by narrowing the

7    scope of the unenforceable non-compete provision to apply only to trade secrets or confidential

8    information.  "Generally, courts reform contracts only where the parties have made a mistake and

9    not for the purpose of saving an illegal contract."  Kolani v. Gluska, 64 Cal. App. 4th 402, 406-07

10   (Cal. Ct. App. 1998) (disapproved on other grounds).  As in Kolani, the "clause here involved is

11   not narrowly tailored . . . . Instead it is an outright prohibition on competition and is void."  Id.

12   And, as in Kolani, Shoreline here argues that the Court should "save the non-compete clause by

13   construing it as merely baring misappropriation of confidential customer lists and trade secrets."

14   Id.  But there is no allegation of mistake by Shoreline.  "No case we have found approves of the

15   rewriting of an illegal covenant not to compete in the manner proposed here."[5]  Id.

16       And the facts, and Shoreline's own allegations, are against Shoreline.  Mr. Sun has not

17   used Shoreline's pricing model to develop business since he left Shoreline.  (X. Sun Decl. ¶ 8.)

18   And, despite the fact that Shoreline's so-called pricing model is not a trade secret, Mr. Sun has

19   offered to search for and destroy any copies of the so-called pricing model in his possession.  (C.

20   Jung Decl. ¶ 2-3; Exh. A.)  Shoreline has rejected this offer.  (C. Jung Decl. ¶ 3.)

21       The so-called pricing model was disclosed to Mr. Sun prior to his signing of

22   confidentiality agreement, and prior to the January 26, 2007 Confidentiality Agreement.  It is not

23   subject to *any* of the agreements signed by the parties, and as discussed below, it is not a trade

24   secret at all.  Shoreline alleges that it was standard practice to give the model to every prospective

25

---

26   [5] The Kolani Court continues: "Further, as the trial court recognized, the policy of Business and Professions Code
     section 16600 would be undermined by doing so. Employers could insert broad, facially illegal covenants not to
27   compete in their employment contracts. Many, perhaps most, employees would honor these clauses without
     consulting counsel or challenging the clause in court, thus directly undermining the statutory policy favoring
28   competition. Employers would have no disincentive to use the broad, illegal clauses if permitted to retreat to a
     narrow, lawful construction in the event of litigation." Kolani v. Gluska, 64 Cal. App. 4th at 407

1    employee, even prior to granting them trainee status, (Compl. ¶ 8) and Shoreline alleges that most

2    employees have signed an Offer Letter with similar non-compete provisions.   (*Ex Parte*

3    Application for TRO ¶ 3).   Shoreline, therefore, claims to have provided its most secret

4    information—the very information upon which Shoreline based its entire business model and

5    without which it will suffer incalculable damages—to ***every person it interviewed***.  Shoreline, by

6    its own allegations, distributes its pricing model as a common practice to people over which it has

7    no legal control whatsoever and cannot hope to establish that the pricing model is a protectible

8    trade secret.

9        Mr. Sun has a protected right to compete with Shoreline, and may legally solicit

10   Shoreline's clients.   "A former employee has the right to engage in a competitive business for

11   himself and to enter into competition with his former employer, even for those who had formerly

12   been the customers of his former employer, provided such competition is fairly and legally

13   conducted." Continental Car–Na–Var Corp. v. Moseley, 24 Cal. 2d 104, 110 (1944).   The

14   solicitation of former clients, in and of itself, is legal activity and will not support a general

15   injunction.   And, as alleged by Shoreline, its customer information is public information.

16   Shoreline states that, "in using the Shoreline Pricing Model, Mr. Sun did not even need a

17   customer list in tangible form.  He could merely look up Shoreline's key investors and vendors

18   and pretend that he had independently developed a formulation like Shoreline's."  (Memo at 21.)

19   It becomes clear that Shoreline seeks the help of the Court to stop Mr. Sun from contacting

20   Shoreline's customers, not to stop the use of secret and damaging information.  If this Court finds

21   that Mr. Sun has employed unfair or illegal methods in soliciting former clients, then Shoreline

22   could, at best, be entitled to an injunction against such *methods*.   Shoreline is not entitled to a

23   general injunction against solicitation of Shoreline's clients by Mr. Sun.

24       Mr. Sun may properly solicit Shoreline's employees so long as he does not use unlawful

25   means or engage in acts of unfair competition. Metro Traffic Control, Inc., 22 Cal. App. 4th at

26   860.  "The interests of the employee in his own mobility and betterment are deemed paramount to

27   the competitive business interests of the employers, where neither the employee or the new

28   employer has committed any illegal act accompanying the employment change." Id.  "It makes

OPPOSITION TO MOTION FOR
                                    PRELIMINARY INJUNCTION

1    no difference that the employees involved had executed noncompete agreements because such

2    restrictions are generally void under Bus. & Prof. C. § 16600." Id.  The solicitation of former

3    employees, in and of itself, is legal activity and will not support a general injunction against

4    competition.  And Shoreline has not presented a serious argument that its employee's identities

5    form a trade secret, under the control of Shoreline, the revelation of which would injure

6    Shoreline.  If this Court finds that Mr. Sun or Shoreline's former employees have committed an

7    illegal act accompanying an employment change, then Shoreline might, at best, be entitled to an

8    injunction against such acts.  Shoreline is not entitled to a general injunction against solicitation

9    of Shoreline's current or former employees by Mr. Sun.

10         Mr. Sun has not used Shoreline's so-called pricing model, and has offered in writing to

11    search for and destroy any copy in his possession.  (C. Jung Decl. ¶¶ 2-3; Exh. A.)  Mr. Sun may

12    legally solicit Shoreline's clients, even those of whom he learned while employed by Shoreline.

13    And Shoreline has alleged that its clients' information is publicly available and that Mr. Sun does

14    not require any confidential information to locate and solicit its clients.  Mr. Sun may also

15    lawfully solicit Shoreline's employees, even if both Mr. Sun and the solicited employee have

16    signed non-compete agreements.  And Shoreline has not even presented a serious argument that

17    its employees' identities are a protectible secret.  None of these activities reforms Shoreline's

18    non-compete clause into a protection against the unlawful distribution of trade secrets.  The Offer

19    Letter's non-competition provisions are unenforceable.   As a result, an injunction against

20    competition, solicitation of clients or solicitation of employees would be improper.

21              **c.      Shoreline's Employment Agreement Terms, Including the Non-
                 Compete Provisions, Are Unfair and Anti-Competitive**

22

23         Shoreline's stated intentions with regard to the non-compete provisions dramatically

24    contravene the public policy behind § 16600.  Mr. Fanger states, unambiguously, that "I included

25    non-compete provisions in the agreement because neither Mr. Sun nor Mr. Du had prior work

26    experience in the fund management business and I wanted to avoid the possibility that we spend

27    time and money providing proprietary know-how only to have them leave and compete."  (B.

28    Fanger Decl. ¶ 12).  Shoreline states that "having trained Mr. Sun to work in [Shoreline's] field,

CASE NO. 5:08-CV-00121-JW                                    OPPOSITION TO MOTION FOR
                                                             PRELIMINARY INJUNCTION

and having revealed to him the materials and information that enable that business . . . it would be unjust and inequitable to for Mr. Sun to continue" in Shoreline's field. (Compl. ¶ 23). It argues that it has the "right not to have Mr. Sun leave Shoreline and enter into competition with it in precisely the same field and geographic market." (Compl. ¶ 20(c)). Shoreline argues that most of its employees "have countersigned employment Offer Letters. In those letters, they have agreed not to resign and, within a period of two years following their departure from Shoreline, compete with Shoreline" in its market. (Memo at 3). Shoreline alleges on several occasions that "the value of its NDAs and employment agreements will be undermined unless it is able to enforce the present ones with Mr. Sun," (Memo at 18) and that "Shoreline will suffer irreparable harm as it is threatened with future employee defections." (Memo at 19). Shoreline appears to believe that the continued ignorance of its workforce is something this Court should support.

Shoreline's contractual provisions have the result of binding its workforce to Shoreline. Mr. Sun's Offer Letter states that Mr. Sun will be hired as a trainee for three months and paid the equivalent of approximately $1,200 per month. (B. Fanger Decl., Exh. B.) It states that *if* after three months ***Shoreline is satisfied*** with Mr. Sun's work, ***Shoreline will then enter negotiations*** with him for employment and salary. (Id.) These conditions purportedly attach at the same time as the non-compete provision. In short, Shoreline engineers a circumstance in which it is under no obligation to continue the trainee's employment, pays practically nothing to the trainee, and allows itself the right to terminate without cause at three months. Shoreline then can force the trainee to decide between taking Shoreline's offer of employment terms and conditions, or forgoing the right to work in Shoreline's chosen market. (B. Fanger Decl., Exh. B). These provision, if enforced, both depress the ability of an employee to negotiate the terms of his employment and prohibit the same employee from leaving Shoreline to find other work in the field. These provision are unfair and anti-competitive, as well as illegal in California. [6]

---

[6] In Latona v. Aetna U.S. Healthcare Inc., 82 F.Supp.2d 1089, 1096-97 (C.D. Cal. 1999), the Court addressed this point thoroughly: "Employees, having no reason to familiarize themselves with the specifics of California's employment law, will tend to assume that the contractual terms proposed by their employer (especially one of Aetna's magnitude) are legal, if draconian. Furthermore, even if they strongly suspect that a non-compete clause is unenforceable, such employees will be reluctant to challenge the legality of the contractual terms and risk the deployment of Aetna's considerable legal resources against them. Thus, the *in terrorem* effect of the Agreement will tend to secure employee compliance with its illegal terms in the vast majority of cases. Prospective future employers,

OPPOSITION TO MOTION FOR
PRELIMINARY INJUNCTION

1    Shoreline's Offer Letters' non-competition provisions are subject to California's strong

2    public policy against the enforcement of non-competition provisions.  Since these non-compete

3    provisions are unlawful (and there is no severability clause), the entire Offer Letter is

4    unenforceable by Shoreline.    This Court should reject Shoreline's efforts both to stifle

5    competition and to trap its employees with an illegal contract.

6        **2.    Shoreline Never Kept Its Spreadsheet Confidential and the Prospective Deal**
         **List Is Publicly Available to the Industry**

7

8    "If an individual discloses his trade secret to others who are under no obligation to protect

9    the confidentiality of the information, or otherwise publicly discloses the secret, his property right

10   is extinguished." Ruckelshaus v. Monsanto Co., 467 U.S. 986, 1002, 104 S. Ct. 2862, 2872 (U.S.

11   1984).  Shoreline never kept its Spreadsheet confidential.  It disclosed the Spreadsheet to Mr. Sun

12   before asking for any confidentiality agreement.  (X. Sun Decl. ¶ 8.)  If its Spreadsheet indeed

13   rose to the level of a protectible trade secret, then Shoreline would have taken steps to protect it,

14   and it would not have shared it with a mere candidate for an purported internship or probationary

15   employment.  Shoreline took no reasonable steps at all.  In fact, Shoreline drafted and executed a

16   confidentiality agreement (after the disclosure) that by its terms, specifically excludes the

17   spreadsheet.  Under this purported agreement, "Proprietary Information ***shall not include*** any

18   information . . . already in the Interested Party's possession . . . ."  (B. Fanger Decl., Exh. A)

19   (emphasis supplied.)  Since the Spreadsheet was already in Mr. Sun's possession, it was not

20   covered by any confidentiality agreement.

21       **a.    Employment Agreement Is Void and Makes No Mention**
         **of Spreadsheet or Potential Deal List**

22

23   As discussed above, the purported employment agreement is flatly against public policy

24   and is void.  But even if the agreement were enforceable, it makes absolutely no mention of any

25   pricing "model" or spreadsheet.    It instead seeks confidentiality protection over "all corporate

26   too, may be reluctant to hire Aetna's workers; even if secure in the knowledge of the unenforceability of Aetna's non-
     compete clause, these employers may well wish to avoid the expense and energy of defending a lawsuit in which they
27   are likely to be joined. In this way Aetna will be able to stifle marketplace competition for its human capital. This
     outcome is clearly in derogation of the fundamental public policy interests that section 16600 was intended to
28   advance." (internal citations omitted).

                                                        OPPOSITION TO MOTION FOR
PRELIMINARY INJUNCTION

1  documents, files, business secrets and know-how." If the Spreadsheet were truly Shoreline's core

2  intellectual property, it would have at least been identified in the purported employment

3  agreement.

4  **b.    Mr. Sun Never Received an Employee Handbook**

5  Mr. Sun never received an employee handbook. (X. Sun Decl. ¶ 11.) Mr. Fanger states

6  that Mr. Sun was given an "Employment Handbook in Chinese", but offers no proof that this is

7  true. Shoreline offers no receipt, no email, no memo or any other document proving that he

8  received the handbook. The only testimony lacks foundation since Mr. Fanger works out of the

9  Campbell office, and fails to establish how he knows that Mr. Sun received it. Fanger's

10  testimony and the self-serving statement that "all of Shoreline's employees, including Mr. Sun,

11  have received the Employment Handbook" (*Ex Parte* Application ¶ 3) is not credible since Du

12  also states that he never received an employee handbook. (C. Jung Decl. ¶ 6-7; Exh. D.)

13  Furthermore, even if Sun had received an employee handbook, Shoreline offers no competent

14  proof of what that handbook says. Shoreline fails to offer a true and correct copy, but only what

15  it purports to be a translation. (B. Fanger Decl. ¶ 13; Exh. D.) Even this purported translation

16  fails to mention by name any so-called Shoreline Pricing Model.

17  **c.    Shoreline's Measures Were Unreasonable**

18  Likewise, none of these three documents makes any mention of any prospective deal list.

19  Shoreline's measures were simply not reasonable to protect its Spreadsheet or any prospective

20  deal list. Shoreline has failed to take reasonable steps to protect its trade secrets. It failed to issue

21  any employee memos regarding confidentiality, does not identify any special labeling procedures

22  for its purported confidential information, and fails even to require that confidential information

23  be returned to Shoreline after termination. (Hon. Ming W. Chin, et al., Cal. Prac. Guide

24  Employment Litigation Ch. 14-C.)

25  **d.    Shoreline's Spreadsheet and Prospective Deal List Were
Generally Known to the Industry**

26

27  Information that is "readily obtainable through public sources . . . do not derive the

28  independent economic value necessary to the existence of a trade secret." Scott v. Snelling and

OPPOSITION TO MOTION FOR
PRELIMINARY INJUNCTION

Snelling, Inc., 732 F. Supp. 1034, 1044 (N.D. Cal. 1990). The California Supreme Court has held that customer lists are not trade secrets where, *inter alia*, the prospective customers are commonly known to the trade or may easily be discovered, there is no evidence that a former employee sought out preferred customers, and the business is highly competitive. Aetna Bldg. Maintenance Co. v. West, 39 Cal. 2d 198, 205 (1952). The Spreadsheet is based on a discounted cash flow calculation, and is widely used throughout the industry. (X. Sun Decl. ¶ 10.) It cannot be a trade secret when it derives from industry-wide practices and is derivative of CarVal's spreadsheet. Likewise, the so-called prospective deal list is sourced from ***publicly-available*** Chinese websites, including http://www.chamc.com.cn/, http://www.cinda.com.cn/, http://www.coamc.com.cn/, and http://www.gwamcc.com/. (Id.) All prospective customers are commonly known to the trade, and in fact both of the WSIB's and Asia Alternatives' websites state that they are open to potential investments. (Id.) (Asia Alternatives was never a Shoreline client during Mr. Sun's tenure at Shoreline. (Id.))

### e.    All of the Deals in Mr. Sun's PowerPoint Were Discovered Through His Independent Research

Every potential deal identified by Mr. Sun in his Powerpoint were discovered through his independent research. For instance:

- HuaRong AMC RMB 130mm OPB Portfolio due in September, 2007: This deal is available publicly at http://www.chamc.com.cn/zcglpt/czxx/111938.shtml.
- Communication Bank: This deal was discovered through a friend of Mr. Sun's with no connection with Shoreline.
- Orient AMC: This deal was discovered through public sources and is available at http://www.coamc.com.cn/sales/Announce.aspx?AnnounceID=124; see also http://www.coamc.com.cn/sales/Announce.aspx?AnnounceID=182
- YueCai RMB: This deal was discovered through public sources and is available at http://www.gdyctz.com/assets_note.asp and it is also available at http://www.gdyctz.com/message2.asp?id=165.

Shoreline fails to offer any evidence that deals are in fact proprietary to their company.

OPPOSITION TO MOTION FOR
PRELIMINARY INJUNCTION

1    And, in any event, any deals that Mr. Sun is purported to have learned of from Shoreline, are at

2    this point, hopelessly stale.  Thus, an injunction would serve no purpose.

3        **3.    Shoreline Cannot Prevail on Its Breach of Contract Claim**

4            As discussed above, Shoreline is unlikely to prevail on its breach of contract claim.  The

5    March 1, 2007 Offer Letter expired by its own terms three months after it was signed, Mr. Sun

6    ceased being paid by Shoreline in July 2007, (X. Sun Decl. ¶ 12.)  Shoreline's continuing non-

7    competition provision is unenforceable, and the presence of the illegal non-competition provision

8    renders the remainder of the non-disclosure provisions unenforceable.  The Offer Letter did,

9    however, serve to extinguish the January 26, 2007 Letter re Confidentiality of Business

10   Opportunity ("Confidentiality Agreement") by providing that "this document will serve as an

11   agreement outlining the terms of your employment" and by immediately thereafter including

12   confidentiality and non-competition provisions without reference to the earlier document

13   regarding the same subject matter.  (B. Fanger Decl.; Exh. B).  The Offer Letter acted as a

14   novation of the Confidentiality Agreement, and in any case, the Confidentiality Agreement

15   applied only to that information supplied to Mr. Sun *after* it was signed and that was to be used

16   for the purpose of assessing Mr. Sun's potential employment opportunity.  Shoreline will be

17   unable to establish that Mr. Sun has breached any enforceable agreement.

18       **4.    Shoreline Will Fail on Its Misappropriation of Trade Secrets Claim**

19           As detailed above, the Spreadsheet was disclosed to Mr. Sun on January 11, 2007, prior to

20   the January 26, 2007 Confidentiality Agreement.  The Spreadsheet is not subject to any of the

21   agreements signed by the parties, and it is not a trade secret.  Shoreline alleges that it was

22   standard practice to give the Spreadsheet to every prospective employee, even prior to entering

23   employment agreements with those prospective employees, (Compl. ¶ 8) and Shoreline alleges

24   that every trainee signed agreements similar to the Offer Letter.  (*Ex Parte* Application for TRO ¶

25   3).  As stated above, Mr. Sun's Offer Letter states that Mr. Sun was to be hired as a trainee for

26   three months and paid the equivalent of approximately $1,200 per month.  (B. Fanger Decl.; Exh.

27   B).  It states that if after three months Shoreline is satisfied with Mr. Sun's work, it will then enter

28

OPPOSITION TO MOTION FOR
PRELIMINARY INJUNCTION

1   negotiations with him for employment and salary.  (Id.)  Shoreline, therefore, claims to have

2   provided its most secret information, the very information upon which it based its entire business

3   model and without which it will suffer incalculable damages, to every person it interviewed.  And

4   even if the interviewees were hired as trainees, Shoreline anticipated firing them within three

5   months.  Furthermore, even where Shoreline did not fire the potential employee, that employee

6   would not be under any legal obligation to continue to work for Shoreline.  Shoreline, by its own

7   allegations, distributes its pricing model as a common practice to people over which it has no

8   legal control whatsoever and, at least in Mr. Sun's case, to persons with whom it has no contract

9   of any kind.

10          **5.      Shoreline Fails to Support Any of the Remaining Causes of Action for Which
               It Seeks Preliminary Injunction**

11

12          In its complaint, Shoreline seeks a preliminary injunction pursuant to several causes of action

13   that it does not even attempt to support in its Memorandum.  Its claims for unfair competition,

14   intentional interference with prospective economic advantage, interference with contract, and unjust

15   enrichment are all neglected, presumably because if it fails to successfully support its breach of

16   contract and misappropriation claims, it will fail on these claims too.

17          Shoreline alleges that Mr. Sun's unfair competition consists of "improper contact and

18   solicitation of Shoreline's investors and customers, and the misappropriation and use of Shoreline's

19   confidential information, particularly the Shoreline pricing model and a list of its prospective

20   asset/portfolio investments."  (Compl. ¶ 45).  These factual allegations have been addressed

21   previously in this Opposition.  Mr. Sun is legally entitled to contact and to solicit Shoreline's

22   customers.  Mr. Sun is entitled to contact and to solicit Shoreline's employees.  Mr. Sun did not

23   misappropriate Shoreline's pricing model or customer lists.  Shoreline stated in its Memorandum that

24   its customer lists are not required to contact its customers and that its customers' information is

25   publicly available.  In the event that Mr. Sun retained a copy Shoreline's prospective asset/portfolio

26   investments list, that list is now between six and nine months old (a substantial period of time in the

27   financial markets) and by now ***hopelessly   stale***.  In short, Shoreline has failed to establish a

28   likelihood that it will prove that Mr. Sun absconded with protectible trade secrets, that he has

- 21 -

OPPOSITION TO MOTION FOR
PRELIMINARY INJUNCTION

1    illegally solicited clients or employees, that its asset/portfolio investment list is still valuable or that

2    Mr. Sun ever used such a list other than during his employ with Shoreline.  There is, therefore, little

3    likelihood of success on this claim, and Shoreline's request for preliminary injunction should be

4    denied.

5         Shoreline alleges that Mr. Sun's intentional interference with prospective economic

6    advantage consists of allegations mirrored in the previous paragraph.  (Compl. ¶¶ 49, 50).  Shoreline

7    has failed to establish a likelihood that it will prove that Mr. Sun misappropriated protectible trade

8    secrets, that he has illegally solicited clients or employees, that its asset/portfolio investment list is

9    still valuable or that Mr. Sun ever used such a list other than during his employ with Shoreline.

10   Shoreline cannot prevail on this claim.

11        Shoreline alleges that Mr. Sun interfered with its contracts when he "contacted . . . investors

12   and attempted to cause them to invest through his new company."  (Compl. ¶ 56).  Shoreline also

13   alleges that Mr. Sun interfered by "soliciting numerous Shoreline employees to leave Shoreline and

14   join Asia LTI."  (Id.)  Shoreline restated the allegations that were addressed in the previous two

15   paragraphs.  And Shoreline added an allegation that Mr. Sun cause "Shoreline's customers to ask

16   questions about Shoreline's presently open fund."  (Compl. ¶ 57).  Again, Mr. Sun is legally entitled

17   to contact Shoreline's investors, clients, employees and vendors.  Shoreline's "accusation" that Mr.

18   Sun has interfered with its contracts by causing Shoreline's clients to educate themselves regarding

19   Shoreline's practices is consistent with Shoreline's claim that Mr. Sun has interfered with its

20   employee agreements by causing Shoreline employees to question the validity of the illegal non-

21   compete provisions in their contracts.  Shoreline has simply regurgitated its prior claims, none of

22   which have merit, to support another attempt at limiting competition.  Shoreline cannot prevail on

23   this claim.

24        Shoreline alleges that Mr. Sun has been unjustly enriched, and that "Mr. Sun breached his

25   obligation to Shoreline and *stole* its confidential information for his own use and benefit." (Compl. ¶

26   63) (emphasis supplied).   Shoreline also alleges that Mr. Sun has derived economic benefit form his

27   *wrongful acquisition* of Shoreline's confidential information."  (Compl. ¶ 64).  Prior to these

28   allegations (and even earlier in the same in the same paragraph) Shoreline has consistently alleged

OPPOSITION TO MOTION FOR
PRELIMINARY INJUNCTION

that Shoreline freely provided this information to Mr. Sun. Clearly, Shoreline cannot now allege that Mr. Sun *stole* this information, or that he wrongfully *acquired* it. In any event, Shoreline must allege that Mr. Sun has been *unjustly* enriched at Shoreline's expense. As has been discussed at length, Shoreline did not make reasonable attempts to keep its information confidential, or its pricing model secret. Mr. Sun's activities are protected by statute and by case law, and Shoreline has not adequately alleged some exception to these laws. And, Mr. Sun has offered to search for and, if found, destroy any copy of the pricing model in his possession. He has offered to return all copies he retains of any of Shoreline's documents or information. He has testified that he has not used the pricing model, and Shoreline has alleged that its customer's information is publicly available. As noted above, "he who comes into equity must come with clean hands." <u>Fibreboard Paper Products Corp.</u>, 227 Cal. App. 2d at 727. Shoreline has attempted, through this lawsuit and its agreements, to stifle competition and confine its employees. Shoreline faces an steeply uphill battle in any attempt to show that its own activities were just, and that any of Mr. Sun's activities were unjust.

## D.    BALANCE OF HARDSHIPS DO NOT TIP SHARPLY IN SHORELINE'S FAVOR

Mr. Sun will be unfairly burdened by the issuance of any preliminary injunction restraining his right to work in his field. Shoreline states that "the injunctive relief it seeks would do no more than require Mr. Sun to adhere to his agreements with Shoreline." (Memo at 22.) But the agreements, written by Shoreline, are draconian, illegal, and contrary to California's public policy. Enforcement of these illegal provisions would leave Mr. Sun without a source of income. It would for an indefinite period of time leave Mr. Sun without the ability to pay for the care of his mother or his family, and without the ability to ply his chosen trade.

On the other hand, Shoreline will not suffer *unduly* if Mr. Sun continues to work in the distressed debt market in China. Shoreline's legal relationship with its employees, and the *status quo*, will not be unduly impacted if no injunction issues. Shoreline has stated that the failure to issue an injunction "would encourage other Shoreline employees, who have signed similar or identical agreements, to disregard the obligations set forth in those agreements with impunity." (Memo at 23). But this is an accurate description of those employee's current rights. Shoreline's

OPPOSITION TO MOTION FOR
PRELIMINARY INJUNCTION

1    employees whose contracts are subject to California law *may* disregard the noncompete

2    provisions with impunity, and may do so regardless of the outcome of this case.  Shoreline will

3    not suffer unduly if its employees learn the truth about their contracts' provisions.

4    **E.    SHORELINE'S "HARM" CANNOT BE IRREPARABLE BECAUSE**
     **SHORELINE WAITED MONTHS BEFORE BRINGING THIS ACTION**

5

6            Similarly, Shoreline does not need the Court to protect its information.  Shoreline has

7    waited at least five months to bring this action.  The financial and client information Shoreline

8    claims requires immediate protection is now between five and nine months old.  Mr. Sun received

9    nothing from Shoreline after July 2007, and received whatever information is at issue in this case

10   prior to that time.  By the standards of the financial market, any deal list, client list, investor list,

11   or asset/portfolio investment list, is now stale and may be valueless.  Shoreline has stated that it

12   constantly updates its pricing model.  If this allegation is true, then the pricing model that

13   Shoreline uses has evolved substantially since the copy given to Mr. Sun on January 11, 2007.

14   The Court should not exercise its power to protect this stale information.

15           And Shoreline is not actually concerned with the immediate protection of this stale

16   information.  If it were, Shoreline would not have waited five months to bring this action.

17   Shoreline's delay in filing and in seeking injunctive relief undercuts its current argument of

18   immediate, irreparable harm. Cf. Oakland Tribune, Inc. v. Chronicle Pub. Co., 762 F.2d 1374,

19   1377 (9th Cir. 1985) ("Plaintiff's long delay before seeking a preliminary injunction implies a

20   lack of urgency and irreparable harm.").  Shoreline alleges that no later than August 2007, Mr.

21   Fanger was notified that Mr. Sun had begun to compete with Shoreline.  (Fanger Decl. ¶ 17; Yang

22   Decl. ¶ 4.1).  Shoreline also alleges that on August 27, 2007, Mr. Sun was in possession of one of

23   its laptops, which Laptop contained all of the information here at issue.  (Fanger Decl. ¶ 16).

24   Shoreline alleges that it suspected him of calling clients, collecting documents, of asking for

25   information that could only be relevant if he intended to compete.  And yet Shoreline waited until

26   January 14, 2008, five months later, before it filed its TRO application with this Court.

27   Shoreline's actions demonstrate Shoreline's lack of urgency and the absence of any real fear of

28

OPPOSITION TO MOTION FOR
                                                              PRELIMINARY INJUNCTION

1   irreparable harm.  Again, this Court is under no obligation to show more concern for expediency

2   than Shoreline itself has shown.

3       In any case, Shoreline will not suffer *irreparable* harm.

4           [T]he key word in this consideration is ***irreparable***. Mere injuries,
            however substantial, in terms of money, time and energy

5           necessarily expended in the absence of a stay, are not enough. The
            possibility that adequate compensatory or other corrective relief

6           will be available at a later date, in the ordinary course of litigation,
            weighs heavily against a claim of irreparable harm.

7

8   Sampson v. Murray,  415 U.S. 61, 90 (1974) (emphasis supplied).  Shoreline states that its pricing

9   model cost "hundreds of hours . . . and hundreds of thousands of dollars" to develop. (*Ex Parte*

10  Application ¶ 2)  While this sounds substantial, Shoreline is still able to quantify it in terms of

11  "money, time and energy necessarily expended" and is therefore ***not irreparable***.  Shoreline

12  simply has not described what, if any, genuinely irreparable harm it might suffer if an injunction

13  does not issue.

14      A California District Court has also rejected the argument that irreparable harm would

15  result if the court did not enjoin defendants from continuing to solicit and employ plaintiff's

16  employees, because that plaintiff would be unable to retain those individuals and "the resulting

17  loss of competitive advantage and goodwill cannot be reasonably ascertained or compensated by

18  money damages."  Givemepower Corp. v. Pace Compumetrics, Inc.,  2007 WL 951350, 7 (S.D.

19  Cal. 2007).  The Court rejected the argument, and held that "a conclusory assertion of 'loss of

20  goodwill' is not sufficient to warrant injunctive relief."  Id. at 7.  The Court also noted that if, as

21  alleged, the plaintiff had "spent many thousand of dollars, locating, engaging and training" its

22  employees, then presumably the plaintiff could quantify its loss. Id.

23  **F.    DISCOVERY SHOULD NOT BE ACCELERATED**

24      Just as Shoreline's delay in this action indicates that it feels no urgency to recover its stale

25  information, Shoreline's delay also indicates that expedited discovery is not required.   The

26  information Shoreline seeks to recover is growing old, losing its relevance, and the possibility of

27  injury based on any improperly used information grows slight.  The causes of action, if valid,

28  grow old.  And, if its allegations are true, Shoreline has updated its client and deal lists, and its

OPPOSITION TO MOTION FOR
PRELIMINARY INJUNCTION

1  pricing model.  The evidence of the parties interactions, however, is not in danger of dissipating.

2  In any event Shoreline has made no such allegation.

3         And Mr. Sun lives in China, is currently in China, and is not available on short notice for

4  deposition.  Mr. Sun is caring for his mother, and he is without the substantial time and financial

5  resources required to travel and respond adequately to an accelerated discovery schedule.

6         Again, this Court is under no obligation to show more concern for expediency than Shoreline

7  itself has shown.

8                                    **<u>CONCLUSION</u>**

9         Controlling Ninth Circuit authority holds that in case such as this, the Court lacks subject

10  matter jurisdiction, and the case must be dismissed.

11        Even if the Court reaches the merits, however, no injunction should issue.  Shoreline has

12  never kept its Spreadsheet confidential.  And the Spreadsheet is not governed by any agreement

13  between the parties.  The purported employment agreement contains an illegal covenant not to

14  compete.  This is flatly against public policy, and renders the entire agreement void.

15        Shoreline has now waited for a period of months before bringing this suit.  Thus, there can be

16  no urgency that justifies a preliminary injunction.  And there are no irreparable injuries at stake since

17  Shoreline has estimated the value of its Spreadsheet.  Thus, damages are an adequate remedy, and an

18  injunction is not necessary.

19        Shoreline has engaged in a disturbing pattern of dissembling and witness intimidation.  This

20  behavior should not be rewarded by an injunction.

21
22  DATED:  January 23, 2008                    NASSIRI & JUNG LLP

23
24                                             By:_____/s/ CHARLES H. JUNG_____
                                                      CHARLES H. JUNG
25
                                             Attorneys for Defendant
26                                           XIAOBING SUN

27

28

CASE NO. 5:08-CV-00121-JW                          OPPOSITION TO MOTION FOR
                                                   PRELIMINARY INJUNCTION