1   CHARLES H. JUNG (SBN 217909)
    MICHAEL P. DILLINGHAM (SBN 244086)
2   NASSIRI & JUNG LLP
    251 Kearny Street, Suite 501
3   San Francisco, CA 94108
    Telephone:  (415) 373-5699
4   Facsimile:  (415) 534-3200
    cjung@nassiri-jung.com
5
    Attorneys for Defendant
6   XIAOBING SUN

7

8

9                   UNITED STATES DISTRICT COURT

10               NORTHERN DISTRICT OF CALIFORNIA

11                        SAN JOSE DIVISION

12

13   SHORELINE CAPITAL MANAGEMENT,        Case No. 5:08-cv-00121-JW
     LTD., a British Virgin Islands Company
14   limited by shares,                   DEFENDANT'S SUPPLEMENTAL
                                          BRIEFING REGARDING SUBJECT
15                  Plaintiff,            MATTER JURISDICTION

16          vs.

17   XIAOBING SUN, an individual,

18                  Defendant.

19

20

21

22

23

24

25

26

27

28

# <u>TABLE OF CONTENTS</u>

FACTS .......................................................................................................................................... 2

    A.    SHORELINE RECRUITS SUN TO MOVE PERMANENTLY TO CHINA .................................... 2

    B.    AFTER MR. SUN MOVED TO CHINA, HIS MOTHER WAS DIAGNOSED WITH CANCER, AND MR. SUN HAS BEEN
HER CAREGIVER SINCE APRIL 2007 ............................................................................................... 2

    C.    MR. SUN ESTABLISHED AN ABODE IN CHINA IN MARCH 2007, AND BY AUGUST, HE INTENDED TO REMAIN IN
CHINA INDEFINITELY ...................................................................................................................... 3

    D.    MR. SUN APPLIED FOR CITIZENSHIP *BEFORE* HE WAS INDUCED BY SHORELINE TO UPROOT HIS LIFE, AND
BEFORE HIS MOTHER WAS DIAGNOSED WITH CANCER ................................................................. 3

    E.    BEFORE MR. SUN KNEW OF ANY LAWSUIT, HE SOLD HIS CAR AND FURNITURE, AND DISSOLVED HIS
CORPORATION OF 5 YEARS ............................................................................................................ 4

    F.    MR. SUN'S MARRIAGE HAS DISINTEGRATED ................................................................. 5

LEGAL ANALYSIS .................................................................................................................. 6

    A.    SHORELINE MISSTATES THE STANDARD ....................................................................... 6

    B.    SHORELINE CONFLATES RESIDENCY IN IMMIGRATION LAW WITH DOMICILE FOR DIVERSITY JURISDICTION ... 7

    C.    THE IMMIGRATION FORM AR-11 IS IRRELEVANT TO DOMICILE ............................... 8

    D.    THE UNDISPUTED FACTS OVERWHELMINGLY SUPPORT THE FACT THAT MR. SUN BECAME A CHINESE
DOMICILE WHEN HE INTENDED TO REMAIN IN CHINA INDEFINITELY IN AUGUST 2007 TO TAKE CARE OF HIS
MOTHER .......................................................................................................................................... 9

    E.    THE CHALLENGED FACTS ARE FEW AND NOT PERSUASIVE ........................................ 11

        1.    *Mr. Sun's Alleged Return Ticket* ................................................................. 11

        2.    *Ms. Wu's Intent Is Irrelevant* ...................................................................... 11

        3.    *Mr. Sun's Company Was Dissolved* .............................................................. 12

        4.    *Ms. Wu's Home Has Been Leased but Cannot Yet Be Sold Because of the Down Market* ........ 12

    F.    ALTERNATIVE FORUMS ARE BETTER SUITED FOR THIS DISPUTE ............................... 12

CONCLUSION ........................................................................................................................ 13

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

## STATUTES

28 U.S.C. § 1332    ............................................................................................................7

8 U.S.C. § 1101    ............................................................................................................7

8 U.S.C. § 1305    ............................................................................................................8

## CASES

McNutt v. General Motors Acceptance Corp., 298 U.S. 178 (1936)  ............................................6

Mississippi Band of Choctaw Indians v. Holyfield, 490 U.S. 30 (1989)  ....................................6

Newman-Green, Inc. v. Alfonzo-Larrain, 490 U.S. 826 (1989)  ................................................6, 7

Savorgnan v. United States, 338 U.S. 491 (1950)  ................................................................8

Williams v. State of North Carolina, 317 U.S. 287 (1942)  ......................................................6

Williamson v. Osenton, 232 U.S. 619 (1914)  ......................................................................6

Acheson v. Yee King Gee, 184 F.2d 382 (9th Cir. 1950)  ........................................................8

Alcarez-Garcia v. Ashcroft, 293 F.3d 1155 (9th Cir. 2002)  ....................................................8

Brady v. Brown, 51 F.3d 810 (9th Cir. 1995)  ......................................................................7

In re Ford Motor Co./Citibank (South Dakota), N.A., 264 F.3d 952 (9th Cir. 2001) ....................7

Singh v. Gonzales, 412 F.3d 1117 (9th. Cir. 2005)  ..............................................................8

Chan Wing Cheung v. Hamilton, 298 F.2d 459 (1st Cir. 1962)  ................................................7

In re Olan, 257 F. Supp. 884 (S.D. Cal. 1966)  ..................................................................7

1    Defendant Xiaobing Sun ("Sun") has been domiciled in China since August 2007.

2  Plaintiff Shoreline Capital Management, Ltd. ("Shoreline") asks this Court to believe that before

3  purportedly being served or knowing anything about this lawsuit, Mr. Sun: (1) took up residence

4  in China, (2) moved in with his mother, (3) cared for her while she underwent surgery for ovarian

5  cancer, (4) stayed with her after her cancer surgery and while her cancer test numbers were

6  worsening, (5) asked the tenant of his Beijing apartment—his mother-in-law—to vacate his

7  apartment so he and his mother could live there, (6) filed papers to dissolve his California

8  corporation of 5 years, (7) bought plane tickets to China with no return ticket to the United States,

9  (8) sold his bedroom furniture, (9) sold his dining room furniture, and (10) sold his car—all

10  simply to craft an argument that this Court lacks diversity jurisdiction. Shoreline stretches the

11  facts beyond recognition to justify subject matter jurisdiction with this Court, when it could have

12  brought this suit in the first instance in state court or in China.

13    Furthermore, Shoreline simply applies the wrong law. Shoreline throughout its

14  memorandum incorrectly conflates residence and domicile, and thus cites the wrong test to this

15  Court. And Shoreline incorrectly offers the alleged absence of an immigration bureau change of

16  address form as proof of U.S. domicile, where the form simply does not apply to Mr. Sun's

17  circumstances at all.

18    Under controlling Ninth Circuit authority, this case must be dismissed. Mr. Sun

19  permanently resides in China, and has no present intent to return to the United States to live.

20  Shoreline successfully induced Mr. Sun to uproot his life and move to China with the promise of

21  permanent employment. And Mr. Sun did move to China, quitting his degree program at the

22  University of Chicago. Nearly all of the facts relating to Mr. Sun's domicile are undisputed. And

23  the balance of the evidence overwhelmingly supports the conclusion that Mr. Sun became a

24  Chinese domicile when he intended to remain in China indefinitely to care for his mother.

25  Because plaintiff brings this case under diversity jurisdiction where defendant is not domiciled in

26  any state, under the controlling Ninth Circuit law, this case must be dismissed for lack of subject

27  matter jurisdiction.

28

CASE NO. 5:08-CV-00121-JW

DEFENDANT'S SUPPLEMENTAL BRIEFING
RE SUBJECT MATTER JURISDICTION

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**FACTS**

A.    **Shoreline Recruits Sun to Move Permanently to China**

Beginning in November 2006, Benjamin Fanger ("Fanger") recruited Mr. Xun from the Graduate School of Business at the University of Chicago. (Declaration of Xiabing Sun "X. Sun Decl." ¶ 2.) Fanger and Shoreline promised Mr. Sun partnership and a permanent position. (<u>Id.</u>) Fanger and Shoreline guaranteed Mr. Sun long-term employment, and they convinced him to abandon his degree program and uproot his life to move back to China. (<u>Id.</u> ¶ 3.) Based on their promises, Mr. Sun quit the University of Chicago and moved to China with the expectation of permanent employment. (<u>Id.</u> ¶ 5.)

B.    **After Mr. Sun Moved to China, His Mother Was Diagnosed with Cancer, and Mr. Sun Has Been Her Caregiver Since April 2007**

On April 5, 2007, only weeks after Mr. Sun moved to China, his mother was diagnosed with Ovarian Cancer. (<u>Id.</u> ¶ 6; Declaration of Yazhao Wang "Y. Wang Decl." ¶ 6.) And on April 15, 2007, his mother had surgery to try to remove her cancer. (X. Sun Decl. ¶ 6.)

The doctor used a "CA125" test to evaluate cancer growth. (<u>Id.</u> ¶ 7.) A higher CA125 result means that the cancer patient is worse off. (<u>Id.</u>) A "normal" CA125 is *lower than* 35. (<u>Id.</u>)

- On April 12, 2007 before her surgery, Ms. Sun's mother's CA125 was *1,110*. (X. Sun Decl. ¶ 9, Exh. A.)

- On May 8 2007, after her surgery and first chemical therapy, her CA125 dropped to 285. (<u>Id.</u> ¶ 10.)

- On September 4, 2007, Ms. Sun's mother's CA125 was 84. (<u>Id.</u> ¶ 11.)

- On October 8, her CA125 rose to *149*. (<u>Id.</u> ¶ 12.)

- On November 7, 2007, Ms. Sun's mother's CA125 rose to *151*. (<u>Id.</u> ¶ 13.)

- And on December 3, 2007, it rose again to 211. (<u>Id.</u> ¶ 14.)

Mr. Sun became so worried that Mr. Sun asked for further diagnosis at one of the best hospitals in China—Beijing Union Medical College Hospital. (<u>Id.</u> ¶ 15.) Mr. Sun's mother was seen at that hospital on December 17, December 26 and January 17. (<u>Id.</u>) The doctors confirmed that her first surgery was not successful. (<u>Id.</u>; Y. Wang Decl. ¶ 11.) The doctors warned that Ms.

Sun's mother needs a second surgery as soon as possible.  (X. Sun Decl. ¶ 16.)  On January 22, 2008 Ms. Sun's mother's CA125 increased to **494**.  (Id. ¶ 17.)

Mr. Sun is his mother's only child, and he must stay in China indefinitely to care for her. (Id. ¶ 18; Y. Wang Decl. ¶ 7.)  His father cannot adequately care for Ms. Sun's mother because he is seventy years old, and sick with heart disease.  (X. Sun Decl. ¶ 18.)

### C.   Mr. Sun Established an Abode in China in March 2007, and by August, He Intended to Remain in China Indefinitely

Mr. Sun has lived in China since March 2007.  (Id. ¶ 19; Y. Wang Decl. ¶ 2.)  Mr. Sun established an abode at HuangPu Street in Guangzhou, China from March 2007.  (X. Sun Decl. ¶ 19.)  When Ms. Sun's mother fell ill, Mr. Sun established an abode in her home on Hongqi South Street in Tianjin China.  (Id.)  Mr. Sun has maintained an apartment at Qijaia Drive in Beijing, China since April 2006.  (Id.; Y. Wang Decl. ¶ 4.)  Mr. Sun allowed Ms. Sun's mother-in-law, Yazhao Wang, to live there in 2007.  (X. Sun Decl. ¶ 19; Y. Wang Decl. ¶ 5.)  But in August 2007, when it became apparent to Mr. Sun that Mr. Sun would need to remain in China to take care of Ms. Sun's mother, Mr. Sun asked Ms. Sun's mother-in-law to move from Ms. Sun's apartment.  (X. Sun Decl. ¶ 19; see also Y. Wang Decl. ¶ 9.)  Mr. Sun needed to live at that abode with Ms. Sun's mother because she receives treatment in Beijing, which is about 80 miles from Tianjin.  (X. Sun Decl. ¶ 19; see also Y. Wang Decl. ¶ 10.)  Mr. Sun's mother moved into his Beijing apartment on January 3, 2008.  (Y. Wang Decl. ¶ 13.)  In August 2007, Mr. Sun intended to remain in China indefinitely.  (X. Sun Decl. ¶ 19.)  Mr. Sun still intends to remain in China indefinitely.  (Id.; see also Declaration of Di Wu "D. Wu Decl." ¶ 16.)

### D.   Mr. Sun Applied for Citizenship *Before* He Was Induced by Shoreline to Uproot His Life, and Before His Mother Was Diagnosed with Cancer

Mr. Sun applied for citizenship in January 2007, before his mother was diagnosed with cancer and before he received an offer from Shoreline.  (Id. ¶ 20.)  Mr. Sun wanted to receive citizenship because both of his two sons were born in the United States, and because Mr. Sun was enrolled in school in the United States at the time.  (Id.)

In June 2007, with his mother, wife and children still in China, Mr. Sun returned from China briefly so that he could conduct his citizenship interview.  (Id. ¶ 21; see also D. Wu Decl. ¶

2.)  Mr. Sun told his interviewer that he was coming from China and that he was taking care of his mother after her cancer surgery.  (Id.)  The interviewer also knew that Mr. Sun must return to China as soon as possible to take care of his mother.  (Id.)  Mr. Sun returned to China after his interview.  (Id.)

Mr. Sun's wife left him in September of 2007.  He did not see her again until he visited the United States for his swearing in ceremony in November 2007.  (Id. ¶ 22.)  Mr. Sun was sworn as a citizen on November 20, 2007.  (Id., Exh. B.)

**E.    Before Mr. Sun Knew of Any Lawsuit, He Sold His Car and Furniture, and Dissolved His Corporation of 5 Years**

As the primary caregiver for his mother, and his marriage in shambles, Mr. Sun began the process of selling his car and his furniture and dissolving his business in November 2007 so that he could return to his domicile in China.  (Id. ¶ 24; see also D. Wu Decl. ¶ 15.)  He started advertising his furniture for sale in November 2007.  (X. Sun Decl. ¶ 27; D. Wu Decl. ¶ 15.)  Before this lawsuit was filed, Mr. Sun sold his bedroom set, dining table, living room furniture, and other furniture.  (X. Sun Decl. ¶ 27.)  He started advertising his car for sale by December 2007.  (Id. ¶ 28, Exh. D.)  Mr. Sun sold his car on January 3, 2008, before this lawsuit was filed.  (Id., Exh. D.)  And Mr. Sun dissolved his company of 5 years, S-Logic Corp. in December 2007.  (Id. ¶ 25, Exh. C; see also D. Wu Decl. ¶ 15.)

Mr. Sun booked his return flight to China on January 2, 2008, before this lawsuit was initiated.  (Id. ¶ 30.)  Mr. Sun returned with his 16 month old son to China on January 21, 2007.  (Id.)  Mr. Sun plans to remain in China indefinitely, and he has no return ticket to the United States.  (Id. ¶ 31, Exh. E; see also D. Wu Decl. ¶ 18.)  Mr. Sun has no permanent address in the United States.  (X. Sun Decl. ¶ 33.)

Mr. Sun and his wife are at a dead end in their marriage.  (Id. ¶ 34; see also D. Wu Decl. ¶ 17.)  Ms. Wu is reluctant, however, to get a divorce because it would take a toll on the children's future, and she fears that her children will be discriminated against in China if they divorce.  (D. Wu Decl. ¶ 17.)  But Ms. Wu is planning to move back to China for now with their older son because she is living off of savings and the cost of living is substantially lower in China.  (X. Sun

4

1    Decl. ¶ 34; D. Wu Decl. ¶ 18.)

2    **F.    Mr. Sun's Marriage Has Disintegrated**

3    Mr. Sun has been married to Di Wu since 1997.  (D. Wu Decl. ¶ 2.)  They have two sons,

4    a younger son who is 16 months old and an older son who is four.  (Id.)  Ms. Wu believes that

5    over time, the responsibility of caring for her son, maintaining the household, paying all the bills

6    and doing the yard and lawn work had shifted onto her shoulders.  (D. Wu Decl. ¶ 5.)  While this

7    was manageable when she had an income and could afford some outside help, it is no longer

8    manageable.  (Id.)  In 2006, Ms. Wu was pregnant with her second child, and Xiaobing stayed in

9    Chicago for most of the time and only rarely came to California (about 3 or 4 days in a month).

10   (Id. ¶ 6.)

11   Dealing with a demanding job, a two-year old toddler, a household, bills and a mother-in-

12   law started to take a toll on Ms. Wu's pregnancy.  (Id.)  Ms. Wu was put on bed rest since her

13   28th week because her obstetrician feared a preterm labor.  (D. Wu Decl. ¶ 7.)  Ms. Wu believes

14   that her marriage with Mr. Sun started to get worse because Mr. Sun was not there at the times the

15   family needed him the most.  (D. Wu Decl. ¶ 8.)  Ms. Wu's second child was born 4 weeks early.

16   (D. Wu Decl. ¶ 9.)  And she spent quite some time in the ICU.  (Id.)

17   In 2007, Mr. Sun was being recruited by Shoreline.  (D. Wu Decl. ¶ 10.)  And because

18   Mr. Sun believed that Shoreline offered a good opportunity to bring some income to support the

19   family, he quit his MBA program, and he moved to Guangzhou in March of 2007.  (D. Wu Decl.

20   ¶ 11.)  Ms. Wu and their children also moved to China in March 2007, but they rarely saw Mr.

21   Sun.  (D. Wu Decl. ¶ 12.)

22   And in September 2007, after Mr. Sun decided to stay in China indefinitely to care for his

23   mother, Ms. Wu left her husband and returned to California.  (D. Wu Decl. ¶ 14.)  Mr. Sun did

24   not return with her.  (Id.)

25   By the time Mr. Sun finally came to the United States on November 19, 2007, his

26   mother's cancer had gotten worse.  (Id.)  He intended to return to China to take care of her.  (D.

27   Wu. Decl. ¶ 14.)  And in November and December he and Ms. Wu posted advertisements to sell

28   his car and furniture, and Mr. Sun dissolved his business S-Logic in December 2007.  (Id.)

5

Ms. Wu believes that Mr. Sun plans to stay with his mother indefinitely. (D. Wu Decl. ¶ 16.) And this upsets her because she feels that Mr. Sun is abandoning her and their children. (Id.) Ms. Sun believes that their marriage is at a "dead end." (D. Wu Decl. ¶ 17.) But she is reluctant to divorce Mr. Sun because of the toll it would take on their children. (Id.) Ms. Sun believes that divorce is still seen as shameful in China, and that her children would be discriminated against if it became known that they are from a divorced family. (Id.)

## LEGAL ANALYSIS

### A.  Shoreline Misstates the Standard

"To be a citizen of [California] within the meaning of the diversity statute, [Mr. Sun] must both be a citizen of the United States *and* be domiciled within [California]." Newman-Green, Inc. v. Alfonzo-Larrain, 490 U.S. 826, 828 (1989) (emphasis in original). Throughout plaintiff's Memo, Shoreline overreaches and misleadingly conflates "living place" or "residence" and "domicile". The question posed by Shoreline is incorrect: in other words, the issue is not "where did Mr. Sun really have a ***living place*** in which he intended to stay" at the time the suit was filed. (Shoreline's Memo re Subject Matter Jurisdiction "Memo" at 6) (emphasis supplied.) The test for diversity jurisdiction is domicile, not "a living place" or "residence."

As the Supreme Court has held, the "essential fact" determining a change of domicile is the intent of making a home at a location "indefinitely." Williamson v. Osenton, 232 U.S. 619, 624 (1914) (holding that where a spouse left her husband to move to another state, domicile changed because of she intended to make a home there for an indefinite time). "For adults, domicile is established by physical presence in a place in connection with a certain state of mind concerning one's intent to remain there." Mississippi Band of Choctaw Indians v. Holyfield, 490 U.S. 30, 48, (1989). The "***motive*** for the change" is "immaterial." Id. at 625 (emphasis supplied). And the fact that a stay in a state is not long is not fatal to the existence of domicile. Williams v. State of North Carolina, 317 U.S. 287, 299, n.9 (1942).

Shoreline, as the "party asserting federal jurisdiction bears the burden of proving the case is properly in federal court." McNutt v. General Motors Acceptance Corp., 298 U.S. 178, 189

DEFENDANT'S SUPPLEMENTAL BRIEFING
RE SUBJECT MATTER JURISDICTION

1   (1936)"; see also In re Ford Motor Co./Citibank (South Dakota), N.A., 264 F.3d 952, 957 (9th

2   Cir. 2001).

3           And controlling Ninth Circuit authority holds no diversity jurisdiction exists under 28

4   U.S.C. § 1332(a)(2) where a United States citizen is domiciled abroad.  Brady v. Brown, 51 F.3d

5   810, 815 (9th Cir. 1995).  A U.S. citizen domiciled abroad is not an "alien for the purposes of 28

6   U.S.C. § 1332(a)(2), which confers jurisdiction when a United States citizen sues aliens only."

7   Id.  As the Supreme Court has held, "United States citizenship destroy[s] complete diversity

8   under § 1332(a)(2)."  Newman-Green, Inc., 490 U.S. at 829.  Likewise no jurisdiction exists

9   under Section 1332(a)(3).  Controlling Ninth Circuit authority holds that where a U.S. citizen is

10  domiciled abroad, he is "thus neither a 'citizen of a state' nor an alien under 28 U.S.C. §

11  1332(a)(3), which confers jurisdiction when a citizen of one state sues both aliens and citizens of

12  other states."  Brady, 51 F.3d at 812-15 (9th Cir. 1995).  And as the Supreme Court has held, a

13  "stateless status" "destroy[s] complete diversity under § 1332(a)(3) . . . ."  Newman-Green, Inc.,

14  490 U.S. at 829.  Mr. Sun's "stateless status destroy[s] . . . diversity under § 1332(a)(3), and his

15  United States citizenship destroy[s] . . . diversity under § 1332(a)(2)."  Id.

16      **B.      Shoreline Conflates Residency in Immigration Law with Domicile for
                 Diversity Jurisdiction**

17          Shoreline simply misstates 8 U.S.C. § 1427.  Shoreline has attempted to miscast

18  "domicile," "residence," and physical presence as fundamentally identical concepts.  The

19  difference is well-settled law.  "'***Residence***' within the Immigration and Nationality Act of 1952

20  is ***not the equivalent of domicile***, and is not determined by that intangible and sometimes elusive

21  concept."  Chan Wing Cheung v. Hamilton, 298 F.2d 459, 461 (1st Cir. 1962) (emphasis

22  supplied).  The Act provides that "[t]he term 'residence' means the place of general abode; the

23  place of general abode of a person means his principal, actual dwelling place in fact, without

24  regard to intent."  8 U.S.C. § 1101(a)(33).  "This definition is but a codification of judicial

25  constructions of the term 'residence' by the Supreme Court, and ***is not synonymous with physical***

26  ***presence*** . . . ."  In re Olan, 257 F. Supp. 884, 893 (S.D. Cal. 1966) (emphasis supplied).  "The

27  term 'residence,' . . . is entitled to a broad and liberal construction.  ***Significantly, it is not***

28

DEFENDANT'S SUPPLEMENTAL BRIEFING
                                                      RE SUBJECT MATTER JURISDICTION

1  *qualified by the words 'actual' or 'continuous.'*  It implies no requirement of physical presence."

2  Acheson v. Yee King Gee, 184 F.2d 382, 384 (9th Cir. 1950) (emphasis supplied).  "The

3  Supreme Court stated that, in contrast to other definitions of 'residence,' . . . *no mention is made*

4  *of intent* . . . .  The inquiry is one of objective fact, and one's intent as to 'domicile' or as to her

5  'permanent residence,' as distinguished from her actual 'residence,' 'principal dwelling place,'

6  and 'place of abode,' is not material."  Alcarez-Garcia v. Ashcroft, 293 F.3d 1155, 1157 (9th Cir.

7  2002) (emphasis supplied) (citing Savorgnan v. United States, 338 U.S. 491, 505 (1950)).

8  Thus quite contrary to Shoreline's representations of the law, Mr. Sun was perfectly

9  capable of "establishing a physical presence in the new jurisdiction" prior to his naturalization.

10  And it was not "impossible for him to establish domicile in China before November 2007."  Thus,

11  Shoreline cannot establish Mr. Sun's alleged failure of Chinese domicile as of January 8, 2008 by

12  Mr. Sun's naturalization.

13  **C.    The Immigration Form AR-11 Is Irrelevant to Domicile**

14  Shoreline further incorrectly asserts that Mr. Sun should have informed the immigration

15  authority of each *Chinese* address change.  But this assertion simply ignores the statutory text.

16  As noted by the Ninth Circuit:

17  § 1305(a) states, 'each alien required to be registered under this subchapter *who is*

18  *within the United States* shall notify the Attorney General in writing of each

19  change of address and new address within ten days from the date of such change .

20  . . .'  The plain language of that statute indicates the address requirement applies

21  only so long as the alien 'is within the United States.'  Since Singh left the U.S.

22  altogether in May 1998, § 1305(a) did not apply to him."

23  Singh v. Gonzales, 412 F.3d 1117, *1122 (9th. Cir. 2005) (emphasis in original).

24  Similarly, Shoreline's assertion ignores even the published instructions for the AR-11

25  form.  A quick glance at the form reveals that it anticipates only U.S. addresses, and does not

26  even provide for foreign address changes.  This fact follows from the purpose of the form, which,

27  as stated by the U.S. Citizenship and Immigration Services website, is "[t]o report the change of

28  address of an alien in the United States."  U.S. Citizenship and Immigration Services, Change of

CASE NO. 5:08-CV-00121-JW

DEFENDANT'S SUPPLEMENTAL BRIEFING
RE SUBJECT MATTER JURISDICTION

Address, at http://www.uscis.gov/ar-11.  Mr. Sun did not change his address to another United States address, and, as noted above, Mr. Sun was not in the United States to report the Chinese address changes.  Since Mr. Sun was not "within the United States" when he moved to care for his mother, he was not required to file an AR-11 form.  Thus, Mr. Sun's actions were in no way inconsistent with his intent to remain at his domicile in China for an indefinite period of time.

### D.    The Undisputed Facts Overwhelmingly Support the Fact that Mr. Sun Became a Chinese Domicile When He Intended to Remain in China Indefinitely in August 2007 to Take Care of His Mother

Shoreline has failed to meet its burden.  The undisputed evidence before this Court shows that Mr. Sun established Chinese domicile *before* he was purportedly served on January 8, 2008.  The following facts, each of which occurred before the purported service, are undisputed:

- Fanger and Shoreline recruited Mr. Sun for a job that would require him to leave his degree program and move to China.  (X. Sun Decl. ¶¶ 2-5.)

- After Mr. Sun moved to China, his mother was diagnosed with cancer.  (Id. ¶ 6; Y. Wang Decl. ¶ 6.)

- On April 15, 2007, his mother had surgery to try to remove her cancer.  (X. Sun Decl. ¶ 6.)

- Mr. Sun was and is his mother's primary caregiver.  (X. Sun Decl. ¶ 18; Y. Wang Decl. ¶ 7.)

- Even after her first cancer surgery, his mother's CA125 levels have remained elevated.  (X. Sun Decl. ¶¶ 7-17.)

- Mr. Sun's mother's CA125 levels showed gradually worsening results throughout the summer and fall of 2007.  (X. Sun Decl. ¶¶ 7-17.)

- His mother needs further surgery.  (Id. ¶ 15; Y. Wang Decl. ¶ 11.)

- Mr. Sun established an abode in Guangzhou, China from March 2007.  (X. Sun Decl. ¶ 19.)

- When Ms. Sun's mother fell ill, Mr. Sun established an abode in her home on Hongqi South Street in Tianjin China.  (Id.)

- Mr. Sun has maintained an apartment at Qijaia Drive in Beijing, China where his

1    mother-in-law lived.  (Id.; Y. Wang Decl. ¶ 4-5.)

2    • In August 2007, when it became apparent to Mr. Sun that he would need to remain

3    in China to take care of his mother, Mr. Sun asked his mother-in-law to move from

4    his apartment.  (X. Sun Decl. ¶ 19; see also Y. Wang Decl. ¶ 9.)

5    • Mr. Sun's mother now lives in Mr. Sun's apartment, and receives treatment in

6    Beijing.  (X. Sun Decl. ¶ 19; see also Y. Wang Decl. ¶¶ 10, 13.)

7    • Mr. Sun applied for citizenship before his mother was diagnosed with cancer and

8    before Mr. Sun received an offer from Shoreline.  (X. Sun Decl. ¶ 20.)

9    • Mr. Sun began the process of selling his car, his furniture and dissolving his

10    business in November 2007 so that he could return to China.  (Id. ¶ 24; see also D.

11    Wu Decl. ¶ 15.)

12    • Mr. Sun started advertising his furniture for sale in November 2007.  (X. Sun Decl.

13    ¶ 27; D. Wu Decl. ¶ 15.)

14    • And before this lawsuit was filed, Mr. Sun sold his bedroom set, dining table,

15    living room furniture, and other furniture.  (X. Sun Decl. ¶ 27.)

16    • He started advertising his car for sale in 2007.  (Id. ¶ 28.)

17    • Mr. Sun sold his car on January 3, 2008, before this lawsuit was filed.  (Id., Exh.

18    D.)

19    • Mr. Sun booked his return flight to China on January 2, 2008.  (Id. ¶ 30.)

20    • Mr. Sun and his wife are at a dead end in their marriage.  (Id. ¶ 34; see also D. Wu

21    Decl. ¶ 17.)  But Ms. Wu is reluctant to get a divorce at this time because it would

22    take a toll on the children's future, and she fears that her children will be

23    discriminated against in China.  (D. Wu Decl. ¶ 17.)

24    In short, it is undisputed that Shoreline recruited Mr. Sun, and that committing to the

25    company required that Mr. Sun leave his degree program and move to China.  After he moved to

26    China, Mr. Sun's mother was diagnosed with cancer.  And he has been her primary caregiver

27    since April of 2007.  Mr. Sun is the only child, and in Chinese tradition, duty bound to (and does)

28    take care of his ailing mother.

DEFENDANT'S SUPPLEMENTAL BRIEFING
RE SUBJECT MATTER JURISDICTION

It is also undisputed that Mr. Sun lived in China for the majority of 2007, that he established an abode in China, or that his mother is now living with him in his abode.  And shoreline does not dispute that Mr. Sun applied for citizenship before he moved to China for what he believed was permanent employment.

And it is not controverted that Mr. Sun, before he was purportedly served or aware of any lawsuit, sold his car, his bedroom furniture and his dining and living room furniture.  There is also no dispute that Mr. Sun and Ms. Wu are at a dead end in their marriage.

It is of course impossible for Mr. Sun to prove beyond a doubt his intent to live indefinitely in China.  (And indeed, it is Shoreline's and not Mr. Sun's burden to establish diversity jurisdiction.)  But almost every key fact and every key indicia of Mr. Sun's intent is undisputed.    And taken together, they show clear and objective intent to stay in China indefinitely.

### E.    The Challenged Facts Are Few and Not Persuasive

Shoreline challenges almost none of the facts that demonstrate Mr. Sun's domicile.  And the facts that it does challenge, it does so incorrectly or misleadingly.

#### 1.    Mr. Sun's Alleged Return Ticket

Shoreline does not challenge that Mr. Sun purchased and booked his return ticket before he ever became aware of this suit.  (X. Sun Decl. ¶ 30.)  But it states that Mr. Sun's confirmation shows an "open return ticket."  (Memo at 5 n.2.)  This is incorrect.  Shoreline apparently refers to the last two line entries of Exhibit E.  (X. Sun Decl. ¶ 32, Exh. E.)  (The top line entry corresponding with "001" shows that the return ticket was booked on January 2, 2008, before the date of the suit.)  The next last entry ("O TO:3*SFO*") shows that as of January 2, Mr. Sun was scheduled to fly from San Francisco International Airport ("SFO") on January 21.  And the last entry, marked "O TO: 4 ***PEK*** . . . TO: ***CAN***" shows that the final open segment was for a flight from Beijing ("PEK") to ***Guangzhou, Canton*** ("CAN").  Thus, there is no return ticket to the United States.  (X. Sun Decl. ¶ 31; see also D. Wu Decl. ¶ 18.)

#### 2.    Ms. Wu's Intent Is Irrelevant

In addition to conflating "residence", "physical presence" and domicile, Shoreline

11

incorrectly focuses on Ms. Wu's "inten[t]".  (Memo at 9 & n.6.)  This is another red herring, and does nothing to contradict the evidence.  The test of domicile is Mr. Sun's intent to remain indefinitely, not Ms. Wu's.  And the uncontradicted evidence proves that Mr. Sun and Ms. Wu do not intend to live together.  Mr. Sun and Ms. Wu are separated, and the reason that they have not divorced is the shame that they and their children would endure if they did so.

### 3.    **Mr. Sun's Company Was Dissolved**

There is no dispute that Mr. Sun executed the proper forms for the dissolution of his company of 5 years (S-Logic).  (Id. ¶ 25, Exh. C; see also D. Wu Decl. ¶ 15.)  And in fact the only competent evidence is that Mr. Sun filed the executed form before the suit was filed.  (Id.)  The allegation (which is not supported by any evidence) that the California Secretary of State has not yet posted on its website a form filed only a few weeks ago does not contradict the fact that Mr. Sun executed and filed the dissolution form.

### 4.    **Ms. Wu's Home Has Been Leased but Cannot Yet Be Sold Because of the Down Market**

Shoreline again offers no evidence that Mr. Sun and Ms. Wu have not "tried to sell the house."  It should be no surprise that with a record credit crisis and slumping home prices, that Ms. Wu and Mr. Sun have not been able to sell the home.  Furthermore, even if Shoreline's allegations were true, Ms. Wu is separated from Mr. Sun.  And it does not prove Mr. Sun's intent to return to California if Ms. Wu and her four year-old boy need a place to live until they move to China.  In any event, on information and belief, Ms. Wu has already leased the house to a tenant.

### F.    <u>Alternative Forums Are Better Suited for This Dispute</u>

While Shoreline seeks to shoehorn this case into federal court, this case is better suited for alternative jurisdictions.  Because Shoreline's purported "principle place of business [is] in Guangzhou, China," China is unquestionably a convenient forum for Shoreline's litigation. (Compl. ¶ 1).  Furthermore, Shoreline employees who provided declarations "mostly work in China."  (Compl. ¶ 6).  And keeping the litigation here, would be unnecessarily expensive for the parties, and burdensome for the Court and witnesses.  Almost all of the witnesses speak little English.  And almost all of the witnesses (including most of Shoreline's principals, their employees, third-party witnesses, and defendant) would be forced to travel extensively to

1    accommodate the "two . . . who work principally in Campbell, California." (Compl. ¶ 6). And

2    Shoreline has already expressed its intent to sue other possible defendants in China. Since many

3    or all of the relevant witnesses are in China, the documents about which Shoreline is purportedly

4    concerned are in China, and Mr. Sun is there, China is unquestionably the better forum for this

5    suit.

6        Furthermore, Shoreline could have avoided dancing around the diversity issue altogether

7    if, in the first instance, it filed this action in California State court. *All* of Shoreline's claims are

8    based in State law, and they could easily be adjudicated without involving the federal courts at

9    all. Shoreline has simply presented no reason why the federal forum is superior to the California

10   State courts or to the remedies available to Shoreline in China.

11

## CONCLUSION

12

13       The notion that Mr. Sun—before ever becoming aware of any lawsuit—contorted his life

14   to move to China and manufactured facts simply to craft an argument that this Court lacks

15   diversity jurisdiction, is too incredible to be believed. Shoreline stretches the facts and the law,

16   straining them both beyond recognition to justify subject matter jurisdiction with this Court. This

17   tap-dancing is simply unnecessary and wasteful since this case is better brought in China or in

18   state court.

19       Shoreline brings this case under diversity jurisdiction. But no jurisdiction exists under 28

20   U.S.C. 1332(a), since no diversity exists between the parties to this action. Mr. Sun is not a

21   citizen of California, nor is he citizen of any other state in the United States. Thus, this Court

22   lacks subject matter jurisdiction over this case, and it must be dismissed.

23

24

25

26

27

28

1    DATED:  January 31, 2008                    NASSIRI & JUNG LLP

2

3                                                By:        /s/ CHARLES H. JUNG
                                                           CHARLES H. JUNG
4
                                                Attorneys for Defendant
5                                               XIAOBING SUN

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28